**I–291 WHY? ASSOCIATION,
Plaintiff-Appellee,**

v.

**Joseph B. BURNS, as Connecticut Commissioner of Transportation, et al., Defendants-Appellants.**

**No. 478, Docket 74–1545.**

United States Court of Appeals, Second Circuit.

Argued April 29, 1975.

Decided May 30, 1975.

Clement J. Kichuk, Asst. Atty. Gen. for the State of Connecticut (Robert K. Killian, Atty. Gen.), for appellants Burns and Koch.

Alphonse R. Noe, Haynes N. Johnson, Stamford, Conn., of counsel, for appellee I–291 Why? Association.

Before MOORE, MANSFIELD and MULLIGAN, Circuit Judges.

PER CURIAM:

This is an appeal by state highway officials[1] from a grant of plaintiff's motion for a preliminary injunction halting construction of about eight miles of highway I–291 southwest of Hartford.[2]

---

1. Joseph B. Burns, Connecticut Commissioner of Transportation; George S. Koch, Connecticut Deputy Commissioner of Transportation, Bureau of Highways. The original defendants-appellants included A. J. Siccardi, Division Engineer for Connecticut Federal Highway Administration; William H. White, Regional Director of the Federal Highway Administration for the Northeastern Region; and Claude Brinegar, United States Secretary of Transportation. The federal defendants-appellants were granted a voluntary dismissal of appeal on May 21, 1974.

2. Actual construction was halted with respect to a 2-mile segment of the eight-mile segment

Plaintiff is an unincorporated association of residents of the proposed highway's corridor.

Plaintiff has filed a complaint seeking injunctive and declaratory relief based on alleged breaches of four federal stat-

utes by defendants. The motion for the preliminary injunction was premised on defendants' alleged breach of duties imposed by the National Environmental Policy Act of 1969, NEPA, 42 U.S.C. § 4331–32 (1970).[3] Plaintiff claims 1)

for which the environmental impact statement subject to attack in this case was prepared. The opinion below is reported. I–291 Why? Association v. Joseph B. Burns, et al., 372 F.Supp. 223 (D.Conn.1974).

**3. § 4331. Congressional declaration of national environmental policy**

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Pub.L. 91–190, Title I, § 101, Jan. 1, 1970, 83 Stat. 852.

**§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall— . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action

that construction of the highway will violate the substantive mandate of § 101(b)(3), 42 U.S.C. § 4331(b)(3) of NEPA to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," by creating a high level of air pollution and noise; 2) that defendants failed to act in accordance with the "continuing responsibility" placed on federal agencies by NEPA insofar as air and noise pollution data obtained by defendants after approval of the original Environmental Impact Statement (EIS) were not incorporated into a supplemental EIS which would have been circulated for comment and approval in appropriate federal channels; 3) that the original EIS was not prepared in accordance with applicable Federal Highway Administration (FHWA) guidelines; 4) that the EIS lacked the adequacy and good faith preparation required by NEPA and was not prepared "by the responsible official" as directed by NEPA since the EIS was prepared by the state officials and not by officials in the Federal Highway Administration; and 5) that a breach of "continuing responsibility" is demonstrated by the failure to file a supplemental EIS once it was learned that the southwest quadrant of the circumferential beltway was the only portion to be constructed in the foreseeable future.

We affirm the grant of the preliminary injunction substantially on the bases set out in the District Court opinion[4] and summarized below.

The beltway in question has been in a variety of state planning stages for several years. In order to have the construction of I–291 occur as part of the federal interstate highway system with 90% of the cost to be borne by the federal government, Connecticut officials submitted design study reports on the beltway along with a request for design approval to the FHWA in August 1970 and in December 1970. In early February 1971, the FHWA Division Engineer notified the Commissioner of the Connecticut Department of Transportation (CONNDOT) that an EIS would be required for I–291. A CONNDOT official prepared a rough draft of an EIS "off the top of his head." This draft was reviewed by an FHWA employee at the division level[5] in February 1971 and CONNDOT personnel who had frequent contact with FHWA personnel then prepared a preliminary draft EIS which was filed in June 1971 and circulated to various federal agencies, not including the Environmental Protection Agency. When comments had been received and after a multidisciplinary review of the preliminary draft, the final EIS was written by CONNDOT personnel who maintained contact with the FHWA division office. The final EIS was submitted to the FHWA division office in printed form in February 1972. Four days later the division office forwarded the EIS to the regional office recommending acceptance which was granted without alteration or comment.

The EIS was filed with the Council on Environmental Quality on September 18, 1972, and on October 4, 1972 public notice by newspaper was given that the EIS was available for inspection for the next thirty days. When thirty days had expired the FHWA Division Engineer for Connecticut granted formal design approval for I–291 on November 6, 1972. The Division Engineer also requested CONNDOT to give further consideration to the noise and air quality impacts of I–291 to reflect advances in evaluation techniques. The 28-page EIS dealt with

---

in any proposal which involves unresolved conflicts concerning alternative uses of available resources; . . .

4. I–291 Why? Association v. Burns, *supra* note 2.

5. The division level refers to the office of FHWA located in Connecticut. The next level in the chain for circulation and approval of the EIS is the regional level, in this case the FHWA regional office in Boston. The regional office is the first level in the circulation of EIS where the capability for multidisciplinary review exists.

noise pollution in a 2-page treatment devoid of any data or other objective support for conclusory statements. Air pollution was treated in one short paragraph again with mere conclusory statements that the impact of the highway was insignificant.

Pursuant to the Division Engineer's request, CONNDOT submitted a noise impact evaluation report in March 1973 noting one area of open space as "noise sensitive" and recommending a noise barrier mound to be constructed at that location. An air quality study performed by consultants was sent by CONNDOT to the FHWA Division Engineer on June 8, 1973 indicating that projected 1990 traffic on I–291 would under "worst case" meteorological and traffic conditions cause the hydrocarbon levels to exceed EPA standards at three points. These two studies were not made "supplemental EIS's" and were not circulated or made public. A week later the Division Engineer granted "plans, specification and estimates" approval for the first two miles of I–291. Pursuant to this approval, carrying a federal commitment to fund 90% of the construction costs, bids were solicited and a contract was awarded in September. The contractor began clearing the site in late September. On October 12, the FHWA Division Engineer notified CONNDOT that the air quality study with its conclusions that I–291 would not cause significant air quality problems was accepted without reservation. Plaintiff retained counsel in late October 1973. Within a few days counsel reviewed the CONNDOT and FHWA files and when the air and noise quality studies and other documentary material as to the decision-making in this case became known to plaintiff, plaintiff filed suit on November 12, 1973.

■ Defendants below asserted laches as an affirmative defense. The District Court analyzed fully the factual setting in making its equitable determination that laches did not bar plaintiff's action. We agree with that analysis and balancing of considerations and with the conclusion that absent a showing of great progress during the alleged delay and in view of the non-public nature of the noise and air quality studies which squarely indicated the inadequacy of the EIS in respect to these elements, laches is not a bar to this suit. *See also* Steubing v. Brinegar, 511 F.2d 489 (2d Cir. 1975).

■ We also agree with the court below that the amount of federal contact in the preparation of the I–291 EIS does not comport with the standard of primary and non-delegable responsibility placed on the federal agency, the FHWA, by NEPA as that standard has been articulated in Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); Conservation Society of Southern Vermont v. Secretary of Transportation, 508 F.2d 927 (2d Cir. 1974); Steubing v. Brinegar, *supra.* Our holding is not meant to imply that we agree with the district court's characterization (at 372 F.Supp. 246 n. 72) of our decision in *Green County Planning Board, supra,* as establishing a *per se* rule to the effect that state participation in the preparation of an EIS renders it invalid.

■ The conclusory treatment of air and noise quality aspects of the EIS were shown to be inadequate by the subsequent air and noise studies. These studies could not cure these particular inadequacies because they were not circulated for review and comment in accordance with procedures established to comply with NEPA. See 42 U.S.C. § 4332(C) (1970). In light of the lack of meaningful federal participation and the inadequacies of the EIS, we affirm the grant of the motion for a preliminary injunction.