NATURAL RESOURCES DEFENSE
COUNCIL, INC., et al.,
Plaintiffs-Appellants,

and

The State of New York,
Intervenor-Appellant,

v.

Howard H. CALLAWAY, as Secretary
of the Army, et al.,
Defendants-Appellees.

No. 916, Docket 75–7048.

United States Court of Appeals,
Second Circuit.

Argued June 23, 1975.

Decided Sept. 9, 1975.

Berle, Butzel & Kass, New York City, and Parmelee, Johnson & Bollinger, Stamford, Conn. (Albert K. Butzel, New York City, Haynes N. Johnson, Stamford, Conn., Peter J. Millock, New York City, of counsel), for plaintiffs-appellants, Natural Resources Defense Council, Inc., and others.

Carl Strass, Asst. Atty. Gen., Washington, D. C. (Wallace H. Johnson, Jacques B. Gelin, Washington, D. C., in place thereof), for defendants-appellees, Howard H. Callaway, and others.

Louis J. Lefkowitz, Atty. Gen. of N. Y. (Samuel A. Hirshowitz, First Asst. Atty. Gen., Philip Weinberg, John F. Shea, III, Asst. Attys. Gen., of counsel), for intervenor-appellant, The State of New York.

Before CLARK, Associate Justice,* MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

The Natural Resources Defense Council, Inc., Environmental Defense Fund, Inc., The Long Island Sound Taskforce, The Fishers Island Civic Association, Inc., along with other environmental and citizen groups, brought this action in the District of Connecticut against the Secretary of the Army, the Secretary of the Navy and other related federal officials seeking declaratory and injunctive relief against further dumping by the United States Navy of highly polluted dredged spoil at the New London Dumping Site in Long Island Sound.[1] The complaint charges violations of the National Environmental Policy Act of 1969, 42 U.S.C.

---

* Supreme Court of the United States, retired, sitting by designation.

1. The New London Dumping site is located approximately two nautical miles directly off the entrance to the New London, Connecticut, Harbor and about one-and-one-half nautical miles to the west of Fishers Island.

§ 4321 et seq. ("NEPA"), and the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 et seq. ("FWPCA"). The State of New York has been allowed to intervene as an appellant.

The action arises out of a project undertaken by the United States Navy at New London, Connecticut. In order to accommodate a new class of submarine, the SSN 688 class, at the Navy's Submarine Base in Groton, Connecticut, the Navy has determined that it is necessary to dredge the Thames River from Long Island Sound to the north boundary of Groton, a distance of 7.5 miles. The new class of submarine is larger and requires a greater depth of water for operations than previous classes and the Navy is accordingly widening and deepening the existing Thames River Channel. This dredging operation requires the removal from the Thames River bottom and disposal of approximately 2.8 million cubic yards of highly polluted material containing volatile solids, industrial wastes and Kjeldahl nitrogen.

The dredging project began on August 19, 1974, and the first phase of dredging, involving the lower reaches of the river, is now complete. The second phase, involving the upper portion of the channel, is scheduled to commence in March 1976 and is to be completed before the arrival of the new submarines at Groton, scheduled for later in 1976. The parties agree that the material to be dredged in the second phase contains considerably larger quantities of pollutants than the material already dredged.

Plaintiffs and intervenors do not object to the dredging project itself, choosing to restrict their legal challenge to the Navy's use of the New London Dumping Site as the disposal area. All parties agree that, because the polluted material is likely to cause great harm to the ocean ecosystem if allowed to disperse after being dumped, it is important that if it is dumped in the ocean it be deposited at a "containment site," an area of the ocean floor where currents and other water movement will not cause it to move or disperse. The underlying disagreement between plaintiffs and the government defendants is over the relative merits of the New London Dumping Site as a containment site and the existence of more suitable sites for disposal both in the ocean and on land. Plaintiffs adduced substantial evidence that because of the shallow depth of the site, the fact that the bottom currents there were higher than at some alternative sites, and the prospective impact of storms, the sludge dumped at the New London Dumping Site, although it would remain in place for a while, would eventually break up and disperse to the northwest where it would contaminate and destroy the first nurseries and marine resources on the coast.

Plaintiffs raised three principal claims before the district court: 1) that the Army Corps of Engineers issued a dumping permit to the Navy in violation of § 404 of FWPCA, 33 U.S.C. § 1344, 2) that the Navy and the Corps failed to comply with NEPA in reaching the decision to dump at New London in that a) the Corps, not the Navy, was the proper party required to prepare the necessary Environmental Impact Statement ("EIS"), b) the EIS inadequately discussed other dumping projects and alternative dumping sites, c) the NEPA decision-making procedures were shortcircuited, and d) there were errors in the EIS, and 3) that the substantive decision by the Navy to use the New London site was arbitrary and capricious. In a thorough and carefully considered opinion the district court, M. Joseph Blumenfeld, Judge, rejected all of these contentions, holding that it lacked jurisdiction under FWPCA, that the Navy was the proper EIS author and that the EIS was adequate in all respects.[2] The plaintiffs-appellants now take issue with all of the district court rulings except those dealing with the alleged errors in the EIS.

We hold that jurisdiction exists under FWPCA and that the discussion in the

2. The district court opinion is reported at 389 F.Supp. 1263 (D.Conn.1974).

EIS of other dumping projects and alternative dump sites was inadequate under NEPA. Accordingly, we reverse and remand as to those issues. Since there is a substantial risk that additional amounts of highly polluted spoil will be dredged and dumped in non-compliance with the FWPCA and NEPA we direct that the Navy be enjoined from such activity until it has satisfied the requirements of these laws. In all other aspects we affirm the district court's opinion.

## DISCUSSION

1. *Jurisdiction Under FWPCA.*

 Under § 404 of FWPCA, 33 U.S.C. § 1344, the disposal of dredged material at the New London site requires a permit from the Army Corps of Engineers.[3] Appellants argued below that the permit for this dumping was issued in violation of § 404(b) of FWPCA because it was not, as required by that section, issued in accordance with dumping guidelines developed by the Administrator of the Environmental Protection Agency ("EPA"). The district court never reached the merits of this contention, however, as it held that it lacked jurisdiction under § 505(a) of FWPCA, 33 U.S.C. § 1365(a), which authorizes citizen suits for violation of the statute. Section 505(b) places certain restrictions on the bringing of lawsuits under § 505(a), including the requirement that no suit or action be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation" to the

EPA and other interested parties. Such notice was given by the plaintiffs herein on July 15, 1974, but the action was commenced on September 3, 1974, less than 60 days later. The district court reasoned that the 60-day waiting period is a jurisdictional prerequisite to suit and therefore dismissed the claim.

 As conceded by the government, the district court's dismissal of the FWPCA count on this ground turns out, by reason of our later decision in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 938–39 & n. 62 (2d Cir. 1974) petition for certiorari filed 43 U.S.L.W. 3648 (U.S., May 9, 1975) (No. 74–1413), to have been in error. We there held that the 60-day notice provision is not an absolute bar to earlier suits by private citizens under FWPCA. Aside from the issue of whether less than 60 days will satisfy § 505(b) so as to permit a suit to be brought under § 505(a), it was held in *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 698–703 (D.C.Cir. 1975), cited with approval and followed in our decision in *Conservation Society*, that § 505(a) is not the exclusive jurisdictional basis for suit under FWPCA and that jurisdiction of claimed violations of FWPCA can exist under either the general federal question statute, 28 U.S.C. § 1331, or the Administrative Procedure Act, 5 U.S.C. §§ 701–06. The result is to give effect to the saving clause of § 505(e) of FWPCA, 33 U.S.C. § 1365(e), which is intended to preserve

3. § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant, including dredged spoil, 33 U.S.C. § 1362(6), into the waters of the United States except in accordance with a permit issued under FWPCA. §§ 404(a) and (b), which authorize the Corps to issue permits for the discharge of dredged spoil in accordance with guidelines developed by EPA, provide in pertinent part:

"Permits for dredged or fill material
"(a) The Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

"(b) Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary of the Army (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary of the Army, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage."
33 U.S.C. § 1344(a) & (b).

all other rights prospective citizen plaintiffs may have under other statutes to seek enforcement of FWPCA provisions.[4] The jurisdiction found to exist under § 1331 for NEPA purposes also exists for FWPCA purposes.[5]

■ The government argues that, even if there is jurisdiction over the FWPCA claim, there has been no violation of § 404(b). The only guidelines that have been issued to date by the EPA for use under § 404(b) are the Ocean Dumping Criteria, 40 C.F.R. Part 220 *et seq.*, which are not directly applicable to this dumping project in inland waters. (Long Island Sound has been deemed by the government to be inland

waters, both in nautical charts and under a definition found in § 3(b) of the Marine Protection, Research, and Sanctuaries Act of 1972, Pub.L. 92–532, 86 Stat. 1052). Because of this lack of guidelines, the government argues, there cannot have been any failure by the Corps to issue the dumping permit in violation of EPA guidelines. However, we are not here dealing with non-existent guidelines. In its notice of intent to issue the dumping permit to the EPA, the Corps made specific reference to the Ocean Dumping Criteria, stating that § 227.64 thereof, which *prohibits dumping in areas where prevailing currents would carry the dumped material into nursery, fishing or shoreline areas,*[6]

---

**4.** Both *Conservation Society* and *Train* found strong support for a liberal interpretation of § 505(e) in the legislative history of that section and the corresponding section of the Clean Air Act, its prototype. See, e. g., S.Rep. No.1196, 91 Cong., 2d Sess., 36–37 (1970). These sources indicate that the provisions for judicial review set out in §§ 505(a) & (b) were not intended by Congress to eliminate previously existing avenues of citizen enforcement of the Act, but were intended to provide an additional citizen remedy. Thus §§ 505(a) & (b) are not the exclusive jurisdictional bases for suit under the FWPCA and suit may be brought under any suitable federal jurisdictional statute. But see *City of Highland Park v. Train*, 519 F.2d 681 at 690–691 (7th Cir. 1975).

In this case there is, furthermore, a strong additional argument for finding jurisdiction under § 505(a), since the purpose of the 60-day waiting period, which is to give the administrative agencies time to investigate and act on an alleged violation, has been served. The EPA and other agencies were given notice by plaintiffs of the alleged violations and plaintiffs were informed before this suit was commenced that no action would be taken.

**5.** The government's citation of *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), holding that the citizen suit provision of the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 *et seq.*, provides the exclusive basis for a private cause of action to enforce duties imposed by that Act, does not change our view that § 505(a) is not the exclusive jurisdictional basis for private suits to enforce the FWPCA. *National Railroad Passenger Corp.* was based upon the legislative history of the Rail Passenger Service Act and the specific language of

that Act, both of which are completely different from the language of the FWPCA. The precedential effect of the decision is therefore limited to cases involving similarly constructed legislation.

**6.** § 227.64 of the EPA's Ocean Dumping Criteria, 40 C.F.R. §§ 220, *et seq.*, provides:

*"Section 227.64 Disposal of Polluted Material*

"Polluted dredged material may be disposed of in the ocean if it can be shown that the place, time, and conditions of dumping are such as not to produce an unacceptable adverse impact on the areas of the marine environment cited in § 227.60(c). When material has been found to be polluted in accordance with § 227.61(c), bioassay tests may be performed when it can be shown that the results of such tests can be used to assist in setting disposal conditions. To minimize the possibility of any such harmful effects, disposal conditions must be carefully set, with particular attention being given to the following factors:

"(a) *Disposal site selection.* (1) Disposal sites should be areas where benthic life which might be damaged by the dumping is minimal.

"(2) The disposal site must be located such that disposal operations will cause no unacceptable adverse effects to known nursery or productive fishing areas. Where prevailing currents exist, the currents should be such that any suspended or dissolved matter would not be carried in to known nursery or productive fishing areas or populated or protected shoreline areas.

"(3) Disposal sites should be selected whose physical environmental characteristics are most amenable to the type of dispersion desired."[1]

would not be violated by disposal at the New London site. Having relied at least in part upon the standards of the Ocean Dumping Criteria to support its selection of the New London site, the Corps cannot now be heard to say that those standards are irrelevant to its issuance of the permit for this dumping project. By its own use of the standards it has made them applicable to this case. The federal courts therefore have the power and the duty to review the application of the Criteria to the extent that they were used by the Corps, cf., e. g., *Feliciano v. Laird*, 426 F.2d 424, 429 (2d Cir. 1970); *Smith v. Resor*, 406 F.2d 141, 145–46 (2d Cir. 1969).

The record also contains evidence that would support findings to the effect that dumping at the New London site violates the Ocean Dumping Criteria as set forth in § 227.64. Plaintiffs introduced considerable proof to the effect that because of the depth and ocean current conditions in the area the highly polluted dredged spoil, despite its initial cohesiveness as a gelatinous mass, would eventually break up and drift northwestward to the Connecticut coast where it would destroy productive fishing and shellfish nurseries and spawning. See testimony of Dr. W. Frank Bohlen, App. 126–27, 131–35, 159–60, 478–80 and Exs. 6A, 13. In response the Navy relies principally upon a study of currents in the area, which plaintiffs label as of little or no value because it was limited to a 25-hour period. App. 303, 451, 497–500. The Navy also relies upon a current-monitoring program that it has been required by EPA to undertake. However, plaintiffs point out that since the polluted spoil would not break up and disperse to the northwest for a few years the monitoring program would not avoid the damage, which would already have been done and would be irreversible once the

dumping had been completed. Furthermore, say the plaintiffs, the monitoring program will be terminated in two years, which is too soon to determine the long-term polluting effect on coastal fisheries of the dumping at the New London site.

Rather than resolve these FWPCA issues upon the record as it stands we prefer to remand the case for findings by the district court which will have the benefit not only of observation of the witnesses who have already testified but also of such additional expert testimony and documentary proof as the parties may offer. Furthermore, should the district court conclude that further Navy dumping on the New London site would violate the Ocean Dumping Criteria which have been adopted and applied as guidelines it may then be called upon to determine whether the Corps is able to sustain its burden of showing that selection of the New London site, as distinguished from some other alternative site which satisfies the Criteria, is justified because of the New London site's economic impact on navigation and anchorage.

2. *Authorship of the EIS.*

The plaintiffs' next contention concerns the authorship of the EIS, which was prepared by the Navy.[7] Section 102(2)(C) of NEPA, 42 U.S.C. § 4332 (2)(C), requires that an EIS be prepared "by the responsible official" for the federal project in question. Plaintiffs argue that the Corps of Engineers through its power to grant or deny permits, 33 U.S.C. §§ 403 & 1344, controlled the environmental decisions connected with the project, including the dredging, designation of disposal site, and dumping of the spoil, whereas the Navy was a mere permit applicant, and that the Corps was therefore the federal agency primarily responsible for the project and for the preparation of the EIS.

---

**7.** In our review of this and plaintiffs' other contentions relating to the adequacy of the EIS and other statements filed under NEPA we are not bound by the clearly erroneous rule since these determinations essentially involve the drawing of legal conclusions and inferences from facts. *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1248 (10th Cir. 1973); see *United States v. Mississippi Valley Co.*, 364 U.S. 520, 526, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

■ If this were a project initiated by a state or a private party the Corps might indeed have been required to prepare the EIS. Our decisions in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* 508 F.2d at 931–33, and *Greene County Planning Board v. FPC,* 455 F.2d 412, 419–20 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), clearly hold that a federal agency cannot abdicate its responsibility independently to evaluate federal actions proposed to it by other, non-federal entities. See *I–291 Why? Association v. Burns,* 517 F.2d 1077 at 1081 (2d Cir. 1975). When two or more cooperating federal agencies are the only entities involved in a proposed project, however, the situation is quite different. Federal participation in the preparation of the EIS is assured. The only issue is which, as between federal agencies, should be treated as the "lead" agency responsible for its preparation. The Council on Environmental Quality ("CEQ") has issued Guidelines which allow for the designation of a "lead" agency to prepare the EIS on all aspects of a federal project involving more than one federal agency.[8] The agencies themselves are to designate the "lead" agency, taking into account

"the time sequence in which the agencies become involved, the magnitude of their respective involvement, and their relative expertise with respect to the project's environmental effects."

40 C.F.R. § 1500.7(b). The district court concluded on the basis of these guidelines that the Navy's preparation of the EIS was not improper. We agree.

■ Although the Corps, by recommending the New London dump site and implying that it would not issue a permit to the Navy unless that site was designated, became rather heavily involved in the project, other evidence demonstrates that the project nevertheless remains essentially a Navy one. The dredging is being done for the benefit of the Navy, at the Navy's expense, and to fulfill a governmental responsibility entrusted to the Navy. Furthermore, since the Navy conceived of the project, it was the first federal agency involved. Thus, while the Corps is a participant to the extent of issuing permits, the Navy is active in all aspects of the project. It, not the Corps, was responsible for drawing up and letting contracts for the work and seeing that the work was properly performed. All of these factors point to the Navy as the responsible agency. See *Hanly v. Mitchell,* 460 F.2d 640, 645 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). Furthermore, only the Navy has continuing responsibility to see that the dredged channel remains at the proper depth and in good repair. See *Upper Pecos Association v. Stans,* 452 F.2d 1233, 1236 (10th Cir. 1971), *remanded for determination of mootness,* 409 U.S. 1021, 93 S.Ct. 458, 34 L.Ed.2d 313 (1972), *appeal dismissed as moot,* 500 F.2d 17 (10th Cir. 1974). Finally, the district court found that no data as to the relative environmental expertise of the two agencies prior to January 1972 had been presented by the parties.

Appellants' further argument that the Navy's partial delegation of its duty as the "responsible official" to a consultant to prepare the EIS violated our decisions in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* and *Greene County Planning Board v. FPC, supra,* misconstrues our holdings in those cases. Rather than hire its own personnel to prepare the impact statement, the Navy in this case contracted out the work to an indepen-

---

8. Although the CEQ Guidelines are only advisory, since the CEQ has no authority to prescribe regulations governing compliance with NEPA, the Guidelines carry significant weight with this court.

"[W]e would not lightly suggest that the Council, entrusted with the responsibility of developing and recommending national policies 'to foster and promote the improvement of the environmental quality,' NEPA § 204, 42 U.S.C.A. § 4344, has misconstrued NEPA."

*Greene County Planning Board v. FPC, supra,* 455 F.2d at 421.

dent consultant. Navy personnel first prepared a short rough draft of the proposed statement and then sent the draft to the consultant along with instructions to expand it on the basis of comments and other information supplied by the Navy. The draft and final versions of the EIS as they now exist were prepared by the independent consultant with minimal editing by the Navy.

We agree with the district court that this procedure is acceptable in these circumstances and is not prohibited by the decisions relied upon by plaintiffs. The evil sought to be avoided by the holdings in *Conservation Society* and *Greene County* is the preparation of the EIS by a party, usually a state agency, with an individual "axe to grind", i. e., an interest in seeing the project accepted and completed in a specific manner as proposed. Authorship by such a biased party might prevent the fair and impartial evaluation of a project envisioned by NEPA. Here no problem of self-interest on the part of the author exists. As the Navy's hiree, the independent consultant has no interest but the Navy's to serve and is fully responsible to the Navy for any shortcomings in the EIS. Therefore, we see no difference for NEPA purposes between this procedure and preparation of the EIS by Navy personnel. In both cases the preparers are guided exclusively by the interests of the Navy and the dictates of the NEPA process. See 389 F.Supp. at 1273–74.

3. *Inadequacy of Discussion in the EIS of Cumulative Effects of Navy and Other Dumping Projects.*

The Final EIS filed by the Navy discussed and evaluated only the environmental impact of this particular Navy project. It did not mention other pending proposals for dumping of approximately an additional 2 million cubic yards of polluted spoil at the New London site or at other nearby areas. The Corps of Engineers proposes, subject to approval and funding by Congress, to dredge the channel of the Thames River to a depth of 41 feet, generating approx-

imately 1,400,000 cubic yards of spoil, with the New London site as a likely dumping spot. The United States Coast Guard, according to a draft EIS recently issued by it, proposes to use the New London site for the dumping of approximately 250,000 cubic yards of spoil. Maintenance of the Thames River channel through 1980 will create approximately an additional 200,000 cubic yards of spoil. The Electric Boat Division of General Dynamics has applied to dredge 300,000 cubic yards from the Thames River near its plant and to dump the spoil at the New London site.

The combined spoil from these proposed projects and from the Navy's project totals approximately 5 million cubic yards. Were it all to be dumped within the next 5 years at the New London site the amount would far exceed the average of approximately 250,000 cubic yards dumped there annually prior to 1972. Indeed the total amount dumped into the entire Long Island Sound during the first eight months of 1972 was 2.1 million cubic yards.

■ In view of the failure of the Navy's Final EIS to make any mention whatsoever of all of these proposed projects or to analyze the possible cumulative effects of the Navy's dumping of 2.8 million cubic yards of highly polluted spoil with the proposals for dredging of an additional 2.15 million cubic yards, which must be dumped somewhere, appellants renew their contention, rejected below, that the EIS is deficient. We agree that in this respect the EIS failed to furnish information essential to the environmental decision-making process.

■ The district court concluded that the environmental impact of the Navy's project may be considered in isolation for the reason that the other dumping projects are tentative or speculative in nature and, unlike segments of a proposed highway which must be considered as part of one major federal development program, see *Conservation Society of Southern Vermont, Inc. v. Secretary*

*of Transportation, supra,* 508 F.2d at 934–35, the Navy's dumping of spoil is unrelated to that required by other projects. The court furthermore concluded that the Navy's use of the New London site, unlike some federal projects, will not have a "bankwagon effect" leading inevitably to use of the same site for the dumping output of the other projects, see *Scientists' Institute for Public Information, Inc. v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973). Although the district court recognized the threat of incremental harm posed by the other proposals for dumping of polluted spoil in the area, 389 F.Supp. 1279–80, it was persuaded that the development of an impact statement for a larger ecosystem was neither feasible nor reasonable. Accordingly the court drew the line at the Navy's single project, reasoning that "The duty to discuss the impact of all possible pollutants cannot be imposed on each isolated project", 389 F.Supp. 1280. We believe that this represents too constricted a view of the informative function of an EIS and of the duty of the responsible agency in preparing it. We agree with the Navy that NEPA does not require it to make a "crystal ball" inquiry, *Natural Resources Defense Council Inc. v. Morton,* 148 U.S. App.D.C. 5, 458 F.2d 827, 837 (1972), and that an EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible, *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir. 1973). A government agency cannot be expected to wait until a perfect solution of environmental consequences of proposed action is devised before preparing and circulating an EIS. On the other hand, an agency may not go to the opposite extreme of treating a project as an isolated "single-shot" venture in the face of persuasive evidence that it is but one of several substantially similar operations, each of which will have the same polluting effect in the same area. To ignore the prospective cumulative harm under such circumstances could be to risk ecological disaster.

As was recognized by Congress at the time of passage of NEPA, a good deal of our present air and water pollution has resulted from the accumulation of small amounts of pollutants added to the air and water by a great number of individual, unrelated sources.

> "Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."

S.Rep.No.91–296, 91 Cong., 1st Sess. 5 (1969). NEPA was, in large measure, an attempt by Congress to instill in the environmental decisionmaking process a more comprehensive approach so that long term and cumulative effects of small and unrelated decisions could be recognized, evaluated and either avoided, mitigated, or accepted as the price to be paid for the major federal action under consideration. E. g., *Natural Resources Defense Council, Inc. v. Morton, supra,* 458 F.2d at 836; see *Scientists' Institute for Public Information, Inc. v. AEC, supra; Jones v. Lynn,* 477 F.2d 885, 891 (1st Cir. 1973). The fact that another proposal has not yet been finally approved, adopted or funded does not foreclose it from consideration, since experience may demonstrate that its adoption and implementation is extremely likely.

In recognition of Congress' purpose the CEQ Guidelines for preparation of impact statements emphasize that consideration should be given not only to the action that is the subject of the EIS but also to "related Federal actions and projects in the area, and *further actions contemplated*" (emphasis added), 40 C.F.R. § 1500.6(a), and direct that the "interrelationships and cumulative environmental impacts of the proposed action and other related Federal projects shall be presented in the statement", 40 C.F.R. § 1500.8(a). Additionally, the

Navy itself has recognized this requirement of broad range consideration and evaluation:

"The point is that a large overview should be maintained toward the magnitude of environmental effects, both of the immediately contemplated action and of future actions for which the proposed action may serve as a precedent or have a cumulatively significant impact."

OPNAVINST 6240, 2c, § 1b (Oct. 4, 1972).

The Navy's impact statement fails to meet this standard of comprehensive evaluation. It is clear that there are at least several other major federal and private dredging projects that are likely to produce colossal amounts of polluted spoil for disposal in this particular area of Long Island Sound—the Corps' further deepening of the Thames River channel, the maintenance of that channel, the dredging of the Thames by the Electric Boat Division of General Dynamics and the Coast Guard's Thames River dredging projects. While none of these projects have gained final approval, all are well beyond the stage of mere speculation and should have been included in the Navy's analysis of environmental impacts. Admittedly, they are not projects contemplated by the Navy and are not directly related to the Navy's dredging of the Thames in the sense that all are part of the Navy's project,

see *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* 508 F.2d at 934–36. On the other hand, all are to occur in the same geographical area, all are related in that they involve dredging and disposal of spoil, all present similar problems of pollution, and the spoil from each project is likely to be dumped in the New London area. Clearly, the projects are closely enough related so that they can be expected to produce a cumulative environmental impact which must be evaluated as a whole. See *Jones v. Lynn, supra,* 477 F.2d at 890–91.[9]

The Navy's failure to consider these and possibly other proposed dredging projects in the New London area is an example of the isolated decisionmaking sought to be eliminated by NEPA. The cumulative environmental impact of disposal of all of this dredged spoil at or near the New London site would clearly be greater than the impacts of the projects individually and the risk of serious environmental consequences (such as the movement of the spoil toward shore) may be correspondingly greater. If the total amount and type of spoil to be disposed of in this area in the foreseeable future is studied objectively by the Navy and the Corps, they may well conclude that some other method of disposal, such as a containment island large enough to contain the spoil dredged from all of these and similar

---

9. The district court found that consideration of cumulative impacts of separate projects is required where the project under consideration may have a "bandwagon effect" of the type discussed in *Scientists' Institute for Public Information, Inc. v. AEC, supra,* 481 F.2d at 1089–90. Such a "bandwagon effect" occurs when the very existence of a completed project tends to compel further development in a particular manner.

Although the district court saw no danger of such an effect here, 389 F.Supp. at 1279, the Navy concedes that the "regulations encourage use of previously spoiled dumpsites (39 Fed.Reg. 12115–12125), for the very reason that little is known about the effects of dumping; it is therefore thought unwise to unnecessarily spoil new sites" (Navy Br., Note 30, p. 36). Thus the Coast Guard, following the

Navy's lead, now proposes in its EIS to use the New London site. Although the Navy adds that, if adverse effects of dumping at the New London site are detected, the Navy would not necessarily continue to use that site, the discovery of such effects through monitoring would, according to the plaintiffs' expert, come too late to remedy the damage, since millions of cubic yards of highly polluted spoil would already have been dumped on the New London site.

Thus, in view of our holding that the cumulative effects of other projects must be considered, while we need not decide whether the Navy's dumping project would necessarily have a "bandwagon effect", the practical consequences of a Navy decision to dump at the New London site may be similar.

projects, should be urged upon Congress as the only effective way of dealing with the problem. The National Marine Fisheries Service has pointed out that such containment islands, which are under way in the Great Lakes and Chesapeake Bay areas, not only have environmental benefits but offer economic advantages as well when used on a large scale, since the cost is then shared by several dumping projects. Another approach that might have been considered favorably if the government were required to take a long-range look at the cumulative effect of the various pending projects would be a plan for adoption of a system of allocation of the most desirable ocean disposal sites so that the worst polluted spoil could be placed at the site most likely to contain it. The Navy's piecemeal approach to environmental consideration prevented any such comprehensive planning.

The Navy seeks to avoid any broad analysis of the cumulative impact of dumping in the New London area on the ground that there is insufficient scientific knowledge about the long-term effects of its proposed New London dumping site project or about the Long Island ecosystem generally to enable it to make an assessment. The preferable course, it argues, would be to proceed with the New London project, subject to possible suspension if the monitoring program should uncover any adverse impacts. The trouble with this suggestion is that it offers "too little and too late" to enable the EIS to be of any effective use. The monitoring program, as we have noted, would probably not discover the adverse effects until millions of cubic yards of polluted spoil had been dumped and had irreversibly been started on what may well turn out to be a program of destruction. The two-year monitoring program, furthermore, is not calculated to measure long-term effects. Although the Navy's project cannot wait on a complete study of the Long Island Sound ecosystem, it is worth noting that the New England River Basin Commission is conducting just such a study. Surely the

Navy's EIS, despite the present paucity of information on cumulative effects, should be required to furnish some information on and analysis of the subject rather than postpone the matter for consideration by others while it embarks upon such a serious project. The Navy is not required to study and report on the effect of its dumping on the whole of Long Island Sound, a relationship as yet not understood. Nor does it need to consider other projects so far removed in time or distance from its own that the interrelationship, if any, between them is unknown or speculative. However, it is required at least to disclose in its EIS other planned or proposed dredging projects in the area of New London and other plans or proposals to dispose of dredged spoil at or near New London, with a discussion and analysis of the combined environmental impact of its own and these other projects.

4. *Adequacy of Decisionmaking Procedure and Consideration of Alternatives to Dumping at New London Site in the EIS.*

Plaintiffs finally attack the procedure followed by the Navy in selecting the New London Disposal Site, contending (1) that it violated NEPA for the reason that the site was chosen without first considering its environmental impact, the Final EIS amounting to nothing more than a post hoc rationalization of a decision already made, and (2) that there was a failure to furnish sufficient information in the Final EIS with respect to reasonable alternative sites to permit a fair consideration and comparison of their respective impacts with that of the New London site.

In the Revised Draft EIS of May 1973 the Navy indicated that it had chosen to dispose of the dredged spoil at Brenton Reef, a site located in Rhode Island Sound off Newport, Rhode Island. Although the site is some 23 miles from the Thames River mouth, it was thought at that time to be the most suitable disposal area because it had previously been used successfully as a site for disposal of

some 8.2 million cubic yards of dredged spoil which had been dumped there in 1967 and 1970 with no adverse effect. Based on the relatively great depth at the Brenton Reef site, the low velocity of bottom currents, and the fact that material previously dumped at the site had stayed in place, the probability was high that material deposited there in the future would not disperse. Sites in Long Island Sound were not considered at that time because Navy studies and EPA comments indicated it to be a poor disposal area.

Just before the Revised Draft was circulated the Navy applied to the Army Corps of Engineers for a permit for dumping at Brenton Reef pursuant to § 404 of FWPCA, 33 U.S.C. § 1344. The Corps rejected the application as "premature" and questioned the economics of dumping at Brenton Reef. Over the next three months, May-July, 1973, the Corps decided, apparently independently of the Navy, that the New London site should be used. The basis for the Corps' decision is not altogether clear, but the choice seems to have been based upon economics,[10] sketchy information regarding the extent to which sediment at the New London site was moved by currents, the fact that the latter site had been previously used, and the abandonment by EPA of its objections to disposal in Long Island Sound.[11] Since the Corps is the permit-granting agency, its views prevailed and the Navy issued an Addendum to the Revised Draft EIS on August 9, 1973, changing the primary disposal site from Brenton Reef to New London. The Addendum erroneously described the change as having been made on the recommendation of the Scientific Advisory Committee of an Interagency Coordinating Committee on Dredging and Ocean Disposal, which in fact only concurred in the change. After further proceedings and public hearings the Final EIS was published in December 1973, designating New London as the disposal site, and the dumping permit for New London was issued by the Corps in April 1974.

Plaintiffs charge that these events have amounted to a shortcircuiting of the agency decisionmaking process mandated by NEPA. They argue that a complete EIS must accompany the proposal for federal action at every stage of the decisionmaking process, see *Greene County Planning Board v. FPC, supra,* 455 F.2d at 420–21, and that the Corps of Engineers' decision to use the New London site was made completely outside of the NEPA processes on the basis of information and considerations never presented in the Revised Draft EIS. In short, they claim that the decision to use New London was made despite the Revised Draft EIS and that the later Addendum and Final EIS were specifically tailored to provide a post hoc rationalization of that decision. The district court rejected plaintiffs' arguments, reasoning that as long as the Corps considered in good faith the environmental factors set out in the Addendum and in the Final EIS "before the permit issues and the decision is finalized" the NEPA process is satisfied and "it should not matter when the Corps 'decides' to use a particular site." 389 F.Supp. 1276.

■ We agree with the district court that the use of supplemental data and statements is permissible to bolster an otherwise deficient EIS or to amend an EIS to consider changes in the proposed

---

10. Use of the Brenton Reef site instead of the New London site was estimated to cost approximately $7,000,000 more.

11. The EPA dropped its objections to disposal in Long Island Sound because it concluded that a recent legislative change had made consideration of dump sites within the Sound possible. The change was Congress' enactment of 33 U.S.C. § 1413(d), which provides that the

Secretary of the Army may authorize the dumping of nonconforming dredge spoil in the ocean if he concludes that no other economically feasible method or site is available. The applicability of this change to the dumping in this case appears doubtful, however, since it does not appear to involve dumping in the ocean, as that term is defined in 33 U.S.C. § 1402(b).

federal action when the "supplemental" adequately remedies the deficiency or analyzes the impact of the proposed change and is properly circulated among the appropriate agencies before a final decision has been reached. We implicitly approved this practice in *I–291 Why? Association v. Burns, supra,* at 1081, although the supplemental statements there had not been adequately circulated to comply with NEPA. The necessity and economy of such a method of amending and supplementing EIS's in light of proposal changes or EIS deficiencies without redrafting or recirculating a whole new document is obvious. Indeed, the CEQ Guidelines specifically provide for the procedure:

> "An agency may at any time supplement or amend a draft or final environmental statement, particularly when substantial changes are made in the proposed action, or significant new information becomes available concerning its environmental aspects. In such cases the agency should consult with the Council with respect to the possible need for or desirability of recirculation of the statement for the appropriate period."

40 C.F.R. § 1500.11(b).

■ Although an EIS may be supplemented, the critical agency decision must, of course, be made after the supplement has been circulated, considered and discussed in the light of the alternatives, not before. Otherwise the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it. The district court here found that the supplemental information was made available by the Navy to the Corps and considered by the latter in good faith before the New London site was finally chosen and a permit issued. Plaintiffs vigorously attack this finding as clearly erroneous, pointing to documentary evidence indicating that the Corps had decided as early as June, 1973 that the New London site must be used by the Navy instead of Brenton Reef, which the Navy had previously chosen, i. e., long before the Navy's brief study of the movement of sediment at the New London site was made and the Addendum prepared. We find it unnecessary to resolve this issue, in view of our conclusion that the permit cannot in any event stand because the Corps was not presented with adequate information on alternative dump sites before issuing it.

The district court, applying a "rule of reason" derived from *Natural Resources Defense Council Inc. v. Morton, supra,* 458 F.2d at 833–34, n. 12, found the consideration of alternatives to be adequate. We disagree with this finding. In our view, even when judged by the "rule of reason" the Addendum failed adequately to explain and evaluate the change of the primary dump site from Brenton Reef to New London and failed to make an adequate analysis of the comparative environmental merits and disadvantages of the New London site and of the alternative sites that had figured prominently in the Navy's earlier decision.

■ Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), specifically requires the inclusion in the EIS of a "detailed statement" of "alternatives to the proposed action", including an evaluation of the environmental consequences of the suggested alternatives, *Natural Resources Defense Council Inc. v. Morton, supra,* 458 F.2d at 834. The importance of this section of the EIS to the NEPA process has been stressed repeatedly by this and other federal courts, e. g., *Monroe County Conservation Society, Inc. v. Volpe,* 472 F.2d 693, 697–98 (2d Cir. 1972); *Calvert Cliffs' Coordinating Committee, Inc. v. AEC,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971); see CEQ Guidelines, 40 C.F.R. § 1500.8(a)(4). It is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that we have characterized as "the linchpin of the entire impact statement", *Monroe County Conservation Society, Inc. v. Volpe,* 472 F.2d at 697–98. Indeed the development

and discussion of a wide range of alternatives to any proposed federal action is so important that it is mandated by NEPA when any proposal "involves unresolved conflicts concerning alternative uses of available resources," 42 U.S.C. § 4332(2)(D). This requirement is independent of and of wider scope than the duty to file the EIS, *Trinity Episcopal School Corp. v. Romney*, 523 F.2d 88 at 93 (2d Cir. 1975); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974).

■■■■ The content and scope of the discussion of alternatives to the proposed action depends upon the nature of the proposal. Generally, however, the preparer of the statement "must go beyond mere assertions" and provide sufficient data and reasoning to enable a reader to evaluate the analysis and conclusions and to comment on the EIS. *Silva v. Lynn*, 482 F.2d 1282, 1287 (1st Cir. 1973). Although there is no need to consider alternatives of speculative feasibility or alternatives which could only be implemented after significant changes in governmental policy or legislation or which require similar alterations of existing restrictions, see *Sierra Club v. Lynn*, 502 F.2d 43, 62 (5th Cir. 1974), *cert. denied*, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (U.S., May 27, 1975) (No. 74–1024); *Natural Resources Defense Council Inc. v. Morton, supra*, 458 F.2d at 836–38, the EIS must nevertheless consider such alternatives to the proposed action as may partially or completely meet the proposal's goal and it must evaluate their comparative merits.[12] In addition, the discussion of alternatives should be presented in a straightforward, compact and comprehensible manner "capable of being understood by the reader without the need for undue cross reference." CEQ Guidelines, 40 C.F.R. § 1500.8(b).

Measured by these standards neither the Addendum of August 9, 1973, nor the discussion of alternative dumping sites in the Final EIS passes muster. The most serious deficiency in the Addendum announcing the change to the New London site is its complete failure to compare the relative environmental pros and cons of all the dumping sites proposed and to explain the reasons for the change. Such a statement is essential to enable all parties to examine the merits of the proposed change. This deficiency is aggravated by the representation that the change was "recommended" by the Committee on Dredging and Ocean Disposal, which was untrue. Also lacking in the Addendum is an evaluation of the containment characteristics of the New London site and a presentation of the risks of major or minor environmental damage peculiar to that site. All of this information would certainly be necessary for the reader to understand and evaluate the proposed change in dumping site. Without it the Addendum simply is not sufficient, when combined with the Revised Draft EIS which it was to supplement, to provide a basis for evaluation of the change to New London.

■■■ If the Final EIS were itself adequate, it might cure the deficiencies in the Addendum since it was circulated several months before the dumping permit was actually issued. That is not the case here, however. The Final EIS itself also fails adequately to justify the change. Its major flaw is the absence of a coherent, understandable presentation and comparison of all of the major alternatives to the New London site. The alternative of dumping at Brenton Reef, the primary site in the Revised Draft EIS, is not even mentioned in the section on alternative sites and is mentioned only in passing elsewhere in the Final

---

**12.** While we agree with the district court that the discussion of alternatives in an EIS is governed by a "rule of reason" we believe that it is not beyond reason to require the EIS to furnish in an understandable fashion a discussion of all dumping site alternatives, their relative merits and demerits with sufficient supporting data, and the reasons for choosing one over the others. Even after making allowances for the admitted lack of knowledge about several of the proposed dump sites, this standard was not met here.

EIS.[13] Two other sites discussed at some length in the Revised Draft EIS and considered as alternatives to Brenton Reef, the "Acid" Site and Site 3, are mentioned in the Final EIS, but there is lacking a concise statement of the merits and demerits of each as compared with the New London site and with the other sites.[14] Similarly, as to the other alternatives actually discussed there is insufficient comparison of the qualities of each site with those of the other sites. At best the statements with respect to each site are conclusory, rather than informative.

By failing to present a complete analysis and comparison of the possible dumping sites, the Final EIS fails to perform its vital task of exposing the reasoning and data of the agency proposing the action to scrutiny by the public and by other branches of the government. See, e. g., *Silva v. Lynn, supra,* 482 F.2d at 1286–87; *Monroe County Conservation Society, Inc. v. Volpe, supra,* 472 F.2d at 697. It leaves the reader completely in the dark as to why the New London site was suddenly chosen over Brenton Reef after the latter had been selected as the most suitable site and it gives only sketchy information as to other sites that had been runners-up to Brenton Reef.

13. We disagree with the district court's conclusion that the evaluation of Brenton Reef was incorporated into the Final EIS by reference. See 389 F.Supp. at 1289. The place in the Final EIS cited by the district court as accomplishing this result simply mentions Brenton Reef as a containment site, and does not lead the reader to other materials discussing its relative merits. This hardly comports with NEPA requirements that alternatives be presented and evaluated in a comprehensive and understandable fashion.

14. The Acid Site, located 10 miles to the southeast of Block Island, was provisionally approved in October, 1973, by the EDA as an acceptable site for the Navy's dumping of the Thames River spoil, i. e., well before the issuance of the Final EIS. The district court concluded that since dumping at the Acid site would be more expensive than at New London and the Acid Site was of uncertain technical feasibility, summary treatment of the Acid Site in the EIS was justified. We disagree. The district court's conclusions were based not on

### 5. Conclusion.

In sum, we hold that the district court has jurisdiction to hear plaintiffs' claimed violation of FWPCA. The Corps of Engineers' voluntary application of part of the Ocean Dumping Criteria makes that part of the Criteria relied upon by the Corps enforceable against it. We affirm the district court's holding that the Navy is the appropriate author for the EIS.

The Final EIS does not meet NEPA standards because of its failure to discuss other dumping and dredging projects in the New London area and their cumulative impact, combined with the Navy's project, on the ocean environment. The Addendum evaluating the change in primary dump site from Brenton Reef to New London fails adequately to compare New London with other dump sites and to explain the Navy's choice. Similarly, the Final EIS fails to present a comprehensible and thorough discussion of all the alternative dumping sites suggested by the Navy and the reasons for choosing New London over the others.

The Navy should not be permitted to proceed with further dumping at the New London site until the FWPCA claim has been resolved and the serious

detailed statements made in the EIS but on part of a transcript of public hearings that was never circulated to agencies or to the public for scrutiny. At the very least the information used by the district court should have been included in the EIS so that its accuracy might have been open to test and discussion.

Site 3, located in Block Island Sound to the southeast of Fisher's Island, although it had been described both in the revised draft EIS and in the EIS as "the best location for an alternative spoil disposal site", was cursorily brushed aside by the Final EIS in less than a page. The district court considered this treatment sufficient, assuming that the Navy lacked any further information. However, the record reveals testimony by Prof. Bohlen that testing had been conducted at Site 3 over a period of 4 years and that the site has several attractive containment characteristics, including greater depth than the New London site and a greater distance from the Connecticut coast, thus reducing the risk of destruction of nursery and spawning near the shore.

deficiencies in the EIS remedied. Otherwise application of a "rule of reason" would convert an EIS into a mere rubber stamp for post hoc rationalization of decisions already made. If the spirit as well as the letter of NEPA is to have any real meaning in this case, the Navy should prepare and circulate for consideration and comment a supplemental statement that will furnish detailed information with respect to (1) other dredging and dumping projects, existing and proposed, in the New London area and their anticipated cumulative impact, when combined with the Navy's Thames River project, on the ocean's environment, (2) all of the alternative dumping sites proposed in the Revised Draft EIS and Final EIS. The supplemental statement must then make a genuine effort in a truly objective fashion to evaluate and compare the qualities of all of the containment sites and, to select one on the basis of clearly stated data and reasoning.

Since the plaintiffs have made out a clear case on the merits and irreparable damage could be caused by resumption of further dumping at the New London site, the district court is directed to issue appropriate temporary injunctive relief designed to maintain the status quo until the FWPCA claim is resolved and the defects in the EIS are remedied.

Reversed in part and remanded for further proceedings consistent with the foregoing.

MULLIGAN, Circuit Judge (dissenting):

On the question of the sufficiency of the EIS I would affirm on the opinion of Judge Blumenfeld below (389 F.Supp. 1263 (D.Conn.1974)), which the majority opinion properly characterizes as "thorough and carefully considered." The major issue on this appeal involves the change of the dumping site from its initial locus, Brenton Reef, to New London. On this point the trial judge, who conducted a three-day trial, concluded:

> There was expert testimony at the hearing on this matter that on the basis of present scientific knowledge there is no way to tell whether Brenton Reef or New London is a better site with respect to containment characteristics. This expert evaluation was by Dr. John B. Pearce, who chaired the meetings of the Scientific Advisory Subcommittee, and Dr. Pearce indicated that this opinion was generally shared by that body. . .
> The court concludes that the evidence presented is enough to meet the relatively light burden placed upon the Navy by the "substantive" standard of review.

Id. at 1292 (footnote omitted). This is a question of fact determined below which I cannot characterize as "clearly erroneous" and hence I see no reason for a remand to conduct further protracted hearings.[1]

The record further establishes to my satisfaction that there is a dearth of information with respect to long-term ecological marine damage from sea dumping. This is precisely why the permit issued here was conditioned upon the maintenance of a comprehensive monitoring and environmental effects study on the site administered by the National Oceanographic and Atmospheric Admin-

---

1. In footnote 7, the majority opinion maintains that the "clearly erroneous" test of appellate review does not apply in our assessment of the adequacy of the EIS since this determination involves the drawing of legal conclusions and inferences from facts, citing *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1248 (10th Cir. 1973). *Sierra Club v. Morton*, 510 F.2d 813, 818 (5th Cir. 1975) is contrary. That court held:

> Having failed to convince the trial court that the EIS was inadequate, the plaintiffs must now demonstrate that the lower court's findings accepting the EIS as adequate and the decision to proceed as permissible were clearly erroneous.

I find no discussion in point in this circuit. When the adequacy of the EIS is questioned because of its alleged failure to properly discuss alternative solutions, their physical viability becomes crucial. That rests upon a question of fact not law and therefore to that extent the clearly erroneous rule should apply. The non-sea dumping alternatives, e. g., total land disposal, dredge soil farming, incineration, container disposal and island construction, were definitely discussed and rejected in the revised EIS.

istration. This program has been funded in the sum of $500,000 and is presently in operation. In the event that any significant adverse environmental effects are detected, the disposal permit may be summarily suspended and the disposal operation will be altered or perhaps moved to a different site which the Corps had agreed to begin to study prior to the commencement of disposal at the New London site.[2]

The future ability of the defendants to control the drifting or leakage of the spoilage at the New London site is a factor which cannot be disregarded and must be given weight in assessing the sufficiency of the EIS. *Sierra Club v. Morton,* 510 F.2d 813, 828 (5th Cir. 1975); *Gulf Oil Corp. v. Morton,* 493 F.2d 141, 144 (9th Cir. 1973). It is further conceded here that the haulage of the spoilage some 23 miles further to Brenton Reef would entail an additional cost of 7 million dollars. In view of these facts and reading the EIS as supplemented, one cannot reasonably describe the agency decision to utilize New London as "arbitrary or capricious," or an "abuse of discretion." *Chelsea Neighborhood Ass'ns v. United States Postal Service,* 516 F.2d 378, 387 n.23 (2d Cir. 1975).

I further disagree with the majority's determination in part 3 of the opinion that the EIS should evaluate the impact of pending proposals as a result of which at some future date other polluted spoil might be dumped at the New London site. In addition to the reasons advanced below, I think it is reasonable to assume that environmental groups will mount further attacks on such projects as assiduously as they have here. It is unrealistic to anticipate projects which have not been finally approved, adopted or funded. Rather, I submit the present

dumping at issue here should be considered by those agencies in making their decisions as to whether or not to utilize New London in the future.

I do agree with the majority that the dismissal of the FWPCA count discussed in part 1 of the opinion was improper in view of our decision in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 508 F.2d 927, 938–39 & n.62 (1974). While I agree that our holding there disposes of the time bar issue, I disagree that any remand is necessary. Assuming jurisdiction to review exists under 33 U.S.C. § 1365(a), 28 U.S.C. § 1331 or the Administrative Procedure Act, 5 U.S.C. §§ 701–706, the issue is whether or not there is a statement of claim for a violation of 33 U.S.C. § 1344. I see none since there was no applicable EPA effluent standard in effect at the time the permit was issued. As the record makes clear, Long Island Sound is considered an inland water and the only standards promulgated by the EPA involve ocean dumping criteria. The fact that the Corps made reference to ocean dumping criteria in the issuance of its permit hardly transforms Long Island Sound into the Atlantic Ocean. These regulations are not applicable on their face and I do not see how territorial expansion of jurisdiction set forth in the regulation can be conferred by consent. While we can insist that an agency follow its own regulations where they are clearly applicable, see *Feliciano v. Laird,* 426 F.2d 424, 429 (2d Cir. 1970), that situation is not here present.

Aside from the question of the adequacy of the EIS as supplemented, I am compelled to disagree with the injunctive relief granted in the majority opinion which precludes further dumping at New London until a new EIS is prepared and

---

2. The so-called Acid Site referred to in the majority opinion, which has never been used as a dumping site in the past, was only brought to the Navy's attention after the EIS was filed. In view of the objections of organized fishermen, it has been dropped from further consideration. However, two other sites in Block Island Sound are being studied as alternative locations in the event the New London site proves to be unsafe. The flexibility provided by the monitoring program is persuasive that the claimed insufficiency of past consideration of alternate proposals in the EIS exalts form over substance.

the FWPCA claim is resolved. The majority argues that injunctive relief is necessary because the plaintiffs have made out a clear case on the merits and irreparable damage could be caused by a resumption of the dumping. While the plaintiffs have prevailed on the merits here the major issue involved is one of the adequacy of the EIS. In light of the staggering costs involved in utilizing another site, the present New London site may be more explicitly supported and the apparent tergiversation of the Government vindicated in any subsequent EIS. The opinion here does not, as I read it, eliminate New London but simply requires a more detailed explication for its selection.

Moreover, I see no proof at all of any immediate irreparable harm which would justify temporary injunctive relief. The monitoring program, which is a condition of the granting of the permit and which was developed in conjunction with the Scientific Advisory Subcommittee, the Army Corps of Engineers, the Navy, the EPA and the States of New York and Connecticut, is certainly designed to prevent any such damage to marine life and to preclude the immediate harm which the majority apprehends. In fact, the principal complaint of the appellants here is that the environmental monitoring program, presently funded for a two-year period, will be ineffective to forestall long-term environmental consequences. There is no serious contention that damage will occur in the immediate future. Moreover, I note that, on the oral argument of this appeal, the appellees represented that further funding and an extension of the program will be sought. In view of the good faith and scientific expertise of the bodies involved, I would consider the damage to

be remote and not established in the record before us.

There is further the question of balancing of hardships, which is a legitimate inquiry in the issuance of the temporary relief here sought. E. g., *Exxon Corp. v. City of New York*, 480 F.2d 460, 463–64 (2d Cir. 1973). The project involved and halted *in medias res* affects the national defense. The work now projected involves widening and deepening the channel from the Gold Star Memorial Bridge to the Naval Submarine Base so that the new SSN 668 submarines (the first of which was scheduled to arrive in July 1975) would have access to the Naval Submarine Base in 1976. The remand here requiring the preparation of a new EIS, with further hearings and undoubtedly further appeals, will obviously delay that project. I can only assume that the deployment of these submarines and their access to the base has some relevancy to the defense of the United States. At the very least the issue should be remanded to determine how vital these interests are in comparison with the interim spoliation which the issuance of the temporary injunction implies. The issuance of an injunction without any opportunity for the trial court to make this factual determination constitutes, I think, an abuse of appellate discretion.

In sum, I believe the injunction and remand directed here are unwarranted. While the EIS as revised may not be as perfectly prepared or polished as my brothers or I would like, I believe with Judge Blumenfeld that under all the circumstances, particularly the existence of the unique environmental monitoring program now in effect, it fully complies with the law. Hence I respectfully dissent.