NATIONAL WILDLIFE FEDERATION

and

Environmental Defense Fund, Plaintiffs,

v.

Clark H. BENN (in his official capacity as District Engineer, Department of the Army, New York District, Corps of Engineers),

and

John W. Morris (in his official capacity as Chief of Engineers, Department of the Army, Corps of Engineers),

and

Clifford L. Alexander, Jr. (in his official capacity as Secretary, Department of the Army), Defendants.

No. 78 Civ. 2118 (CHT).

United States District Court,
S. D. New York.

June 12, 1980.

Kenneth S. Kamlet, National Wildlife Federation, Washington, D. C., James T. B. Tripp, Environmental Defense Fund, New York City, of counsel, for plaintiffs.

John S. Martin, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendants; Peter R. Paden, Asst. U. S. Atty., New York City, of counsel.

## OPINION

TENNEY, District Judge.

This action involves the ocean dumping of dredged materials from the New York Harbor area into the Mud Dump Site, an ocean dumping ground in the New York Bight located off the coasts of New York and New Jersey. The plaintiffs are two non-profit corporations concerned with the conservation and preservation of natural resources. The defendants are the District Engineer of the Army Corps of Engineers for the New York District ("NYD"), the Chief of Engineers for the Army Corps of Engineers ("Corps"), and the Secretary of the Army ("Secretary"). The plaintiffs contend that the defendants have failed to comply with various statutory and regulatory requirements in conducting federal programs and licensing private projects that involve the ocean dumping of dredged materials. As a result of developments

that have ensued since this action was commenced, several of the plaintiffs' original charges have been dismissed pursuant to a stipulation between the parties or become moot. Three basic claims remain in this action. The plaintiffs contend that the Corps is violating federal statutes and regulations by: (1) pooling and averaging the results of bioassay tests that are designed to measure the toxicity of dredged soil in terms of the mortality rates of the tested species; (2) using a 10% factor in determining what mortality rate represents a significant undesirable environmental effect; and (3) treating individual ocean dumping projects as isolated ventures and not requiring a programmatic Environmental Impact Statement ("EIS") for the entire area. The defendants deny these charges. They also claim that the plaintiffs' claims are not "ripe for review" and that the Environmental Protection Agency ("EPA") is a necessary party in this action.

The plaintiffs' motion for summary judgment and the defendants' motion to dismiss or for summary judgment are now before the Court. The Court finds that the plaintiffs' claims are ripe for review and can be resolved in the absence of the EPA. After reviewing the extensive documents and affidavits submitted by the parties, the Court concludes that the defendants should be granted summary judgment with respect to the first two claims described above and the

plaintiffs' motion for summary judgment should be granted on the third.

*Background*

The Marine Protection, Research and Sanctuaries Act of 1972 ("MPRSA"), 33 U.S.C. §§ 1401 *et seq.*, was enacted to "regulate the dumping of all types of materials into ocean waters and to prevent or strictly limit the dumping into ocean waters of any material which would adversely affect human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." *Id.* § 1401(b). The statute was amended in 1974 to implement the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter ("Convention"), which had recently been ratified by the United States. Pub.L. No. 93–254, 88 Stat. 50 (codified at 33 U.S.C. §§ 1401 *et seq.*). The Administrator of EPA ("Administrator") is authorized under MPRSA to issue permits for ocean dumping "[e]xcept in relation to dredged material, . . . where the Administrator determines that such dumping will not unreasonably degrade or endanger human health, welfare, . . . or the marine environment . . . ." 33 U.S.C. § 1412(a). The Administrator is directed to establish and apply "criteria" for reviewing permit applications and the statute delineates numerous considerations that should be reflected in these criteria. *Id.*[1] Additionally, MPRSA provides that in developing and revising the criteria, the Administrator

---

1. These considerations include:

(A) The need for the proposed dumping.

(B) The effect of such dumping on human health and welfare, including economic, esthetic, and recreational values.

(C) The effect of such dumping on fisheries resources, plankton, fish, shellfish, wildlife, shore lines and beaches.

(D) The effect of such dumping on marine ecosystems, particularly with respect to—

(i) the transfer, concentration, and dispersion of such material and its byproducts through biological, physical, and chemical processes,

(ii) potential changes in marine ecosystem diversity, productivity, and stability, and

(iii) species and community population dynamics.

(E) The persistence and permanence of the effects of the dumping.

(F) The effect of dumping particular volumes and concentrations of such materials.

(G) Appropriate locations and methods of disposal or recycling, including land-based alternatives and the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest.

(H) The effect on alternate uses of oceans, such as scientific study, fishing, and other living resource exploitation, and nonliving resource exploitation.

(I) In designating recommended sites, the Administrator shall utilize wherever feasible locations beyond the edge of the Continental Shelf.

33 U.S.C. § 1412(a).

should apply the standards binding on the United States under the Convention.[2]

Dredged material, defined as "any material excavated or dredged from the navigable waters of the United States," *id.* § 1402(i), is treated separately in the statute. Section 1413(a) provides that the Secretary "may issue permits, after notice and opportunity for public hearings, for the transportation of dredged material for the purpose of dumping it into ocean waters, where the Secretary determines that the dumping will not unreasonably degrade or endanger human health, welfare, . . . or the marine environment . . . ." In making this determination, the Secretary must apply the criteria established by the Administrator relating to the effects of dumping. *Id.* § 1413(b). The Secretary is directed to make independent determinations regarding the need for dumping, appropriate locations for the dumping, and other possible methods of disposal. *Id.* Prior to issuing any permit, the Secretary must notify the Administrator, and, if the latter disapproves, the permit cannot be granted. *Id.* The Secretary cannot issue a permit that does not comply with the criteria and restrictions established by the Administrator pursuant to section 1412 unless the Administrator grants a waiver for that specific case. *Id.* In connection with federal projects involving dredged material, the Secretary may, in lieu of the permit process, issue regulations requiring the application of the same criteria and procedures that are applied to the issuance of permits for other projects. *Id.* § 1413(e). The Secretary's permit authority has been formally delegated to the Corps' Chief of Engineers and, through him, to the District Engineers, the Chief's authorized representatives. 33 C.F.R. § 324.4. NYD is responsible for regulating dredging and dumping operations in New York Harbor.

The Final Revision of Ocean Dumping Regulations and Criteria ("Criteria") were issued on January 11, 1977. 42 Fed.Reg.

2462, 40 C.F.R. §§ 220–229. Part 27, entitled Criteria for the Evaluation of Permit Applications for Ocean Dumping of Materials, constitutes the criteria established pursuant to section 1412 of MPRSA and applies to all dumping operations. Subsection 227.-13 deals specifically with dredged materials that are described as consisting "primarily of natural sediments or materials which may be contaminated by municipal or industrial wastes or by runoff from terrestrial sources such as agricultural lands." In accordance with MPRSA, the Criteria state that the ocean dumping of dredged materials is to be regulated by the Corps, "using the criteria of applicable sections of Parts 227 and 228." 40 C.F.R. § 227.13. Part 228 concerns "the evaluation of [ocean dumping proposals] in relation to continuing requirements for effective management of ocean disposal sites to prevent unreasonable degradation of the marine environment from all wastes being dumped in the ocean." *Id.* § 228.1. The EPA is directed to designate areas where dumping of dredged materials will be allowed, subject to the specific conditions of permits issued by the Corps. *Id.* § 228.4(e). Both general and specific criteria for site selection are described. *Id.* §§ 228.5, 228.6.

Detailed procedures for conducting the environmental impact tests prescribed by the Criteria were developed by a joint EPA-Corps Technical Committee. *See id.* § 227.-27(b) (footnote reference to forthcoming manual jointly prepared by both agencies). The report issued by the Committee in July 1977 is entitled Ecological Evaluation of Proposed Discharge of Dredged Material into Ocean Waters and is commonly referred to as the "Implementation Manual." Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memorandum I"), Appendix E. According to the Manual's Introductory Statement, it "attempts to provide a balance between the technical state-of-the-art and routinely im-

---

**2.** While the plaintiffs do not concede that the Convention itself is "non-enforceable," they state that their reference to or reliance upon various Convention provisions is intended to serve "only as an aid to the construction of the Criteria." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss and/or for Summary Judgment at 14–15.

plementable guidance for using the procedures specified in the [Criteria] and is intended to encourage continuity and cooperation between [Corps] Districts and EPA Regions in evaluative programs for . . . permit activities. . . . The manual is not intended to establish standards or rigid criteria." This lengthy report includes: summaries and discussions of the procedures for ecological evaluation of dredged material required by the Criteria; tests to implement these procedures; sample collection and preservation processes; evaluation procedures; calculations; interpretive guidelines; and supporting references. *See* Implementation Manual at 2. By its own terms, the Manual "cannot stand alone." It is "imperative" that the supporting references be consulted and that both the Criteria and Manual be read in their entirety before any tests or evaluations are commenced. *Id.*

In November 1977, NYD issued a document referred to as the "NYD Guidance Document," which was based on the Criteria and delineated the test results that must be furnished to the Corps by any applicant seeking a permit for ocean dumping. Affidavit of Dennis J. Suszkowski, sworn to October 20, 1978, Exh. J. As a result of discussions between NYD and the EPA regarding the refinement of certain testing techniques, a revised document was drafted and became effective on February 15, 1979. Supplemental Affidavit of Dennis J. Suszkowski, sworn to February 5, 1979, ¶¶ 2, 3, 6. The modifications incorporated in the revised NYD Guidance Document resolved several of the charges originally made by the plaintiffs in their complaint. *See id.* ¶ 9–12.

The plaintiffs' remaining claims do not challenge the revised NYD Guidance Document or the Implementation Manual. Nor do the plaintiffs contest any single ocean dumping permit that has been approved by the Corps. Instead, the plaintiffs contend that NYD has granted permits and approved projects without adhering to testing and evaluation standards established by the Criteria, either expressly or by reference to the Convention. While the plaintiffs view

the Manual as "a laudable effort to develop routine procedures for implementing the Criteria," they contend that "where it intrudes into the area of specifying the regulatory consequences of individual tests, it begins to stray beyond the competence of the scientists who prepared it." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss and/or for Summary Judgment ("Plaintiffs' Memorandum II") at 2–3. The plaintiffs thus assert that the Implementation Manual cannot be followed or relied upon when it is inconsistent with or contradicts the Criteria. The Criteria constitutes "the legal standards against which the Corps' decisionmaking must be evaluated," and the plaintiffs argue that "the Corps is invested with no greater ability to construe the Criteria than the Court." *Id.* at 3. Finally, the plaintiffs state that "to the extent that the views of any agency are entitled to special attention or deference by this Court . . ., it is the [EPA], as the author of the Criteria, and not the [Corps], whose views should be considered." *Id.* at 3–4.

The plaintiffs also allege that the defendants have violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4347, by failing to draft a programmatic EIS that would study and evaluate the cumulative environmental effects of continuously dumping dredged material in the Mud Dump Site. NEPA provides that all federal agencies "shall include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented.

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

*Id.* § 4332(2)(c). The obligations imposed by NEPA on federal agencies are more fully described in various orders and regulations. See, e. g., Guidelines of the Council on Environmental Quality, 40 C.F.R. Part 1500 ("CEQ Guidelines"). Among the "actions" that may require the preparation of an EIS are new and continuing projects, either directly undertaken by federal agencies, or conducted pursuant to a federal permit. 40 C.F.R. § 1500.5; 33 C.F.R. § 209.410(e). The ocean dumping of dredged material can constitute such an action. *See Natural Resources Defense Council v. Callaway*, 524 F.2d 79 (2d Cir. 1975); *Wisconsin v. Callaway*, 371 F.Supp. 807 (W.D.Wis.1974); 33 C.F.R. § 209.410(e).

The defendants have prepared several EIS's relating to individual federal and private dumping projects. The plaintiffs assert, however, that the Corps' usual practice is to issue an Environmental Assessment, a document that is not subject to public and inter-agency review and comment. The plaintiffs contend that these project-specific reports are "woefully deficient" and do not consider the cumulative impact of ocean dumping. In their view, the defendants have violated the mandate of NEPA by failing to treat the Mud Dump Site as a single location subject to federal action requiring the preparation of an area-wide EIS.

The defendants, in turn, contend that they are in full compliance with MPRSA, the Criteria, and NEPA. NYD claims that it adheres to the Implementation Manual which represents an authoritative interpretation of the Criteria by the Corps and EPA. According to the defendants, the decisions of agencies responsible for administering MPRSA and the Criteria are entitled to great deference and weight, particularly when the issues involve "scientific techniques barely out of the research phase." Defendants' Memorandum of Law in Reply to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss and/or For Summary Judgment ("Defendants' Memorandum I") at 12. The defendants also contend that the plaintiffs' demand for a programmatic EIS must fail because it is made in the "abstract" and is not addressed to any particular proposals or projects. In their view, the plaintiffs cannot challenge NYD's failure to draft a comprehensive EIS without singling out some pending or issued permit for which only an individual and allegedly deficient environmental statement or assessment was prepared.

Apart from their defense on the merits, the defendants argue that the plaintiffs' claims are not ripe for review and cannot be entertained in the absence of the EPA, which the defendants allege is a necessary party to this action. After addressing these preliminary contentions and rejecting defendants' contentions, the Court turns to the three basic claims raised here. The Court concludes that neither NYD's practice of pooling bioassay test results nor its use of a 10% factor in determining significant adverse environmental impact violate the Criteria or the Implementation Manual. However, the Corps' failure to develop a programmatic EIS describing the cumulative impact of ocean dumping in the Mud Dump Site does constitute a violation of NEPA and related regulatory provisions.

*Ripeness*

[T]he ripeness doctrine['s] . . . basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

In determining whether a claim is ripe for review, a court must evaluate both "the fitness of the issues for judicial decision and the hardship to the parties of

withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

The defendants argue that the plaintiffs' claims fail to satisfy this standard. They contend that the plaintiffs are litigating on the basis of hypothetical facts and speculation about future agency action because no specific permit or project has been challenged. The defendants assert that the Corps' regulatory program is extremely complex and subject to constant reevaluation and revision. Therefore, according to the defendants, the policies and procedures challenged here are not sufficiently finalized to permit judicial review.

Defendants also contend that the claims made here are not amenable to review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, or MPRSA's citizen suit provision, 33 U.S.C. § 1415(g). Section 704 of the APA provides that a court may review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." Section 1415(g) of MPRSA provides that any person may commence a suit to enjoin any agency allegedly in violation of "any prohibition, limitation, criterion, or permit" established under the Act. According to the defendants, the practices challenged by the plaintiffs are not "final agency action" within the meaning of the APA. Furthermore, they argue, MPRSA's citizen suit provision does not expand the scope of judicial review beyond the bounds set by the APA.

Finally, defendants claim that the Corps' conduct results in no immediate harm to the plaintiffs that warrants judicial intervention. In their view, the absence of such harm, combined with the allegedly abstract nature of plaintiffs' claims, renders this dispute inappropriate for judicial resolution.

■ The Court rejects the defendants' characterization of both the nature of the plaintiffs' claims and the degree of harm that could result from postponing judicial review. While the plaintiffs have not challenged a specific permit or project, they have attacked a clear and consistent pattern of conduct constituting agency action.

The plaintiffs have not simply leveled generalized charges against the Corps; they are challenging specific procedures and policies to which the Corps concededly adheres in issuing permits and approving projects. The issues raised by the plaintiffs concern the construction and intent of the Criteria and do not turn on the factual circumstances of a particular permit. Nor does the Corps' failure to prepare a programmatic EIS relate to a specific factual context; the plaintiffs NEPA claim can be resolved on the basis of an established administrative pattern. It is true that the Corps may change or modify its practices at any time. Indeed, several of the plaintiffs' claims have become moot as a result of revised procedures adopted after this action was commenced. Yet the mere potential for change does not preclude judicial action, and the Corps' current positions seem quite firmly entrenched. *See Continental Air Lines v. C.A.B.,* 522 F.2d 107, 116, 124–28 (D.C.Cir.1975) (en banc); *cf. Diamond Shamrock Corp. v. Costle,* 580 F.2d 670, 672–74 (D.C.Cir.1978) (EPA regulations not ripe for review until they were applied in some permit proceeding).

The practices challenged here constitute "final agency action" within the meaning of the APA and are subject to review under MPRSA. As stated by the Second Circuit, "[w]hether an agency action is final for purposes of the APA should not depend on semantic characterizations but rather on a careful evaluation of the separate but coordinate functions of courts and administrative agencies and of the impact of the challenged action on the parties." *Aquavella v. Richardson,* 437 F.2d 397, 404–05 (2d Cir. 1971). The Corps' issuance of ocean dredging and dumping permits are reviewable pursuant to the APA or MPRSA. *See Citizens Committee for Hudson Valley v. Volpe,* 425 F.2d 97 (2d Cir. 1970), *cert. denied,* 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1971) (APA); *Long Beach v. New York,* 445 F.Supp. 1203 (D.N.J.1978) (MPRSA). Practices and procedures consistently followed by the Corps in issuing permits and approving projects should be

equally subject to judicial review, particularly when the issues are well defined and do not require a specific factual setting.

The hardship that would result to the plaintiffs if judicial review were postponed or withheld is sufficient to render their claims ripe for review. Obviously, the environmental injuries alleged here cannot, and need not, be measured in economic terms. *Cf. Illinois v. Milwaukee*, 406 U.S. 91, 98, 92 S.Ct. 1385, 1390, 31 L.Ed.2d 712 (1972) ("The considerable interests involved in the purity of interstate waters would seem to put beyond question the jurisdictional amount provided in § 1331(a)."). Nor does this action resemble the typical case where a court grants review "because private parties are confronted with a painful choice between immediate compliance with an agency's policy, at great expense, and the risk of serious penalties should their challenge in a later proceeding be unsuccessful." *Diamond Shamrock Corp. v. Costle*, *supra*, 580 F.2d at 673. Numerous judicial decisions, however, have firmly established that allegations of injury to important environmental interests may constitute substantial harm deserving of judicial intervention. *See, e. g., United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Cady v. Morton*, 527 F.2d 786 (8th Cir. 1975); *Citizens Committee for Hudson Valley v. Volpe, supra*.

Many of the members of the plaintiff organizations use the beaches and coastal areas of the New York Bight for recreation and other purposes. Plaintiffs' Complaint ¶¶ 5, 8. The plaintiffs, on behalf of their members, contend that these individuals suffer substantial injury from the pollution that allegedly results from the Corps' per-mit and dumping procedures. *Id.* The defendants do not challenge the plaintiffs' standing to bring this action and recognize "the importance of the environmental interests they seek to protect." Defendants' Memorandum I at 13. In the view of the Court, the hardships allegedly imposed on these interests are sufficient to warrant judicial review of the claims asserted here.

The Court thus concludes that the plaintiffs' claims are "fit for judicial decision" and that their resolution will not create undue or premature "judicial interference" with the administrative process. *See Abbott Laboratories v. Gardner, supra*, 387 U.S. at 148–49, 87 S.Ct. at 1515.

### EPA's Joinder Not Required

The defendants contend that the EPA is a necessary party to this action and must be joined pursuant to Federal Rule of Civil Procedure ("Rule") 19.[3] The defendants assert that the plaintiffs are challenging NYD actions that conform to the directions provided in the Implementation Manual. According to the defendants, "[s]ince EPA and the Corps are jointly responsible for the Implementation Manual, and since the Technical Committee still in existence for the purpose of modifying and updating the Implementation Manual is jointly chaired and composed of Corps and EPA representatives, any relief relating to the procedures set forth in the manual requires an order against the Administrator of the EPA as well as against the Secretary of the Army." Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Memorandum II") at 60. Defendants also contend that they

---

3. Rule 19 provides in part:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

could be subject to "inconsistent obligations" if the Court rules in plaintiffs' favor because the Court order would be contrary to the procedures prescribed by the Manual. Finally, defendants state that because the EPA has "the final word" on issuing dumping permits, *see* 33 U.S.C. § 1413(c), that agency is equally responsible for NYD's policies.

The defendants' arguments are premised on the erroneous assumption that the plaintiffs are challenging mandatory provisions in the Implementation Manual that are binding on the Corps. Rather, with respect to the pooling and 10% factor issues, the plaintiffs contend that "the Implementation Manual is merely ambiguous or neutral, and that all [the relief] required . . . is a clarification from the Court as to what the Criteria require." Plaintiffs' Memorandum II at 17. Furthermore, if the EPA were seriously concerned that its own interests were threatened or unrepresented in this litigation, it could move to intervene in the action pursuant to Rule 24.

The defendants do recognize, however, that it would be pointless to join the EPA if the Court rules that the Corps' current interpretation and application of the Implementation Manual procedures are consistent with the Criteria. *See Heath v. Aspen Skiing Corp.*, 325 F.Supp. 223, 229–30 (D.Colo. 1971). Because the Court so rules, joinder of the EPA is clearly unnecessary.

*Pooling of Bioassay Test Results & The 10% Factor*

The Criteria requires that before a permit may be issued, the proposed project must be evaluated as to the need for ocean dumping, the impact of the proposed dumping on aesthetic, recreational, and economic interests, and the environmental effect of dumping the material into the ocean waters. If dredged material consists primarily of sand or other natural ocean bottom material, and satisfies other criteria specified in 40 C.F.R. § 227.13, it may be deemed environmentally acceptable for ocean dumping without conducting more detailed tests. If the material does not satisfy these preliminary screening criteria, it must be subject to various tests described in Subpart B of the Criteria. These tests require separating the dredged material into three component parts (liquid phase, suspended particulate phase, and solid phase) and then determining whether any component contains toxic chemicals that may cause "significant undesirable effects, including the possibility of danger associated with their bioaccumulation in marine organisms." *Id.* § 227.6(b). Toxicity testing is accomplished by means of marine organism bioassays that involve direct laboratory exposure of various marine species to samples of the dredged material. With respect to the tests conducted on the solid phase component of the material, the Criteria states:

> These bioassays shall be conducted with sensitive benthic organisms using benthic bioassay procedures approved by EPA, or, for dredged material, approved by EPA and the Corps of Engineers. Procedures approved for bioassays under this section will require exposure of organisms for a sufficient period of time to provide reasonable assurance, based on considerations of statistical significance of effects at the 95 percent confidence level, that, when the materials are dumped, no significant undesirable effects will occur due either to chronic toxicity or to bioaccumulation of the constituents listed in paragraph (a) of this section . . . .

*Id.* § 227.6(c)(3). Similar provisions govern the bioassay testing procedures for the other component parts of the dredged material. *See id.* § 227.6(c)(1), (2).

Section 227.13 of the Criteria, which pertains specifically to dredged materials, provides that such material may be deemed environmentally acceptable for ocean dumping when the bioassays on the three component parts of the material show "that it can be discharged so as not to exceed the limiting permissible concentration." *Id* § 227.13(c). The limiting permissible concentration is generally defined as that concentration of a constituent (1) that does not exceed applicable marine water quality criteria, *id.* § 227.27(a)(1) (liquid phase component), or (2) that does not cause unreason-

able acute or chronic toxicity or other sub-lethal adverse effects, *id.* (b) (suspended particulate and solid phase), or (3) that will not cause accumulation of toxic materials in the human food chain, *id.* (same). These latter determinations are to be based on bioassays conducted in accordance with pro-cedures designed by the EPA and the Corps and described in the jointly prepared Imple-mentation Manual. *Id.* n. 1.

The Criteria requires the use of at least three different marine species in perform-ing the various bioassay tests to assure that species sensitive to the chemicals present in the dredged material are exposed to the material proposed to be dumped. *See id.* (c), (d). The plaintiffs assert that "[c]on-trary to the requirements of the Criteria and sound scientific practice, . . . the Corps is pooling the results of these individ-ual bioassays for statistical purposes, not analyzing them separately." Plaintiffs' Memorandum I at 16. According to the plaintiffs, the Corps' practice permits dredged material to be dumped into the New York Bight, "even where bioassay tests have shown that such spoils produce [statistically significant] increased mortali-ty in the more sensitive marine species." *Id.* While the Criteria does not directly address the pooling issue, the plaintiffs con-tend that several provisions clearly indicate that a pooling approach was not deemed acceptable. Relying on statements made by well qualified scientists, the plaintiffs argue that the pooling of bioassay data is scientif-ically unsound and could not have been contemplated by the Criteria. Finally, plaintiffs contend that the Implementation Manual is "at worst neutral on the question of pooling of mortality results," *id.* at 20, and, in any event, the Criteria—not the Manual—must govern.

The plaintiffs' second MPRSA claim against the Corps charges that NYD's prac-tice of "discounting the results of solid-phase bioassay tests unless they demon-strate a mortality increase that is not only statistically significant but also exceeds 10% . . . . is legally and scientifically unten-able." Plaintiffs' Memorandum I at 21. The plaintiffs argue that NYD's reliance on

a 10% factor violates the Criteria, is not compelled by the Implementation Manual, and is not supported by scientific evidence.

The defendants, as expected, contend that all their procedures comply with the Criteria, the Implementation Manual, and sound scientific principles. In response to allegations made by plaintiffs' experts, the defendants point to other scientists who support the Corps' position.

This Court is neither equipped nor in-clined to thrash through this thicket of sci-entific debate. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Rather, in resolving this challenge to administrative action, the appropriate standard of review serves to narrow the scope of judicial inquiry. *See Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Ap-plying this standard, the Court concludes that the defendants are entitled to summa-ry judgment with respect to plaintiffs' MPRSA claims.

*Standard of Review*

In construing administrative regulations, "the ultimate criterion is the administra-tive interpretation, which becomes of con-trolling weight unless it is plainly errone-ous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.*, [*supra*, 325 U.S. at 414, 65 S.Ct. at 1217]. *See also INS v. Stanisic*, 395 U.S. 62, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969).

*United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977).

While regulations may appear vague or unclear, the Court "need not tarry . . over the various ambiguous terms and com-plex interrelations of the regulations." *Id.* This less demanding standard of review has frequently been applied to challenges against EPA regulations. *See, e. g., Sierra Club v. EPA*, 540 F.2d 1114, 1123–24 (D.C. Cir.1976), *cert. denied in part*, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811, *cert. granted in part*, 430 U.S. 953, 97 S.Ct. 1597, 51 L.Ed.2d 802, *vacated and remanded*, 434

U.S. 809, 98 S.Ct. 41, 54 L.Ed.2d 64 (1977) (applying arbitrary and capricious standard of review); *Ethyl Corp. v. EPA, supra,* 541 F.2d at 33–37 (court must hold agency to "certain minimal standards of rationality"). The interpretation of an agency that not only promulgated the regulation but is also responsible for its administration is entitled to great respect. *United States v. Goldberg,* 527 F.2d 165, 172 (2d Cir. 1975), *cert. denied sub nom. Pocono Int'l Corp. v. United States,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

Another important element to consider in evaluating an administrative regulation is "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), *quoted in Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287 n.5, 98 S.Ct. 566, 574 n.5, 54 L.Ed.2d 538 (1978). The primary rationale for this restrained judicial review is that deference should be accorded to an agency's expertise. *Wilderness Soc'y v. Morton,* 479 F.2d 842, 866 (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). An administrative construction, therefore, carries more weight when it concerns matters peculiarly within the agency's jurisdiction. *See Southern Mutual Help Ass'n v. Califano,* 574 F.2d 518, 526 (D.C.Cir.1977). As stated by the Second Circuit, the normal standard of review of "the interpretation of a regulation by the agency charged with its administration . . . is to decide whether the . . . interpretation of the Regulation is unreasonable and inconsistent with its purpose." *General Elec. Co. v. Occupational Safety & Health Review Comm'n,* 583 F.2d 61, 64 (2d Cir. 1978).

The plaintiffs implore this Court to "resist the temptation to 'take the easy way out' by deferring to the asserted expertise of the Corps." Plaintiffs' Memorandum II at 4–5. According to the plaintiffs, the rule stated in the *Bowles* case, quoted above, is

inapplicable to the case at bar because the administrative interpretation challenged here is not that of the agency that promulgated the regulations. Because the EPA wrote the Criteria, that agency's views—and not the Corps'—should receive special attention by this Court. The plaintiffs have attempted to show that the EPA's position is consistent with the plaintiffs' interpretation of the Criteria's requirements and contrary to the Corps' practices. Finally, plaintiffs assert that even where the administrative interpretation is furnished by the "proper agency," the Court need not "accord blind deference" to that interpretation. *Id.* at 4.

This Court has no intention of avoiding its responsibility by blindly deferring to administrative interpretations of detailed regulations. Yet the Court holds that the narrower standard of review described above is appropriate in this case. The Implementation Manual describing the Criteria's procedural requirements was jointly prepared by the EPA and the Corps—a joint endeavor specifically mandated by the Criteria. While the plaintiffs state that they are challenging the Corps' actions in applying the Manual's procedures, and not the Manual itself, they do criticize defendants' reliance on the Manual and state that the document is "of limited relevance to the resolution of the legal issues in this case." *Id.* at 3. Furthermore, the Criteria expressly grants the Corps responsibility for issuing ocean dredging permits and thus this agency's construction and application of the regulations are not to be taken lightly. Finally, as discussed further below, the Corps' position does not appear to be at odds with those procedures and policies advocated by the EPA.

*The Corps' Procedures Do Not Violate the Criteria or MPRSA*

As stated above, the Criteria does not directly discuss the practice of pooling mortality data in evaluating bioassay test results. And, contrary to the plaintiffs' assertions, the Implementation Manual permits the combination of raw data over spe-

cies in determining the outcome of the tests. *See* Implementation Manual at F11, F12; Affidavit of Aubrey D. Magoun, sworn to October 23, 1978 ("Magoun Aff."), ¶ 2. The plaintiffs' contentions that this procedure is scientifically unsound is refuted by the government's experts. *Compare, e. g.,* Affidavit of Jerold H. Zar, sworn to November 3, 1979, ¶¶ 6–13, *with* Magoun Aff. ¶¶ 2–4. While the issue appears unresolved, this Court is constrained to accept the agency's reasonable interpretation of the regulatory requirements.

■ Furthermore, statements by EPA officials, which were submitted by the plaintiffs, lend support to the Corps' position. The EPA's letter states in part:

> The bioassay manual provides an example exhibiting pooling the raw data from the benthic bioassays and performing the statistical data analyses on the entire array of pooled data to determine if a statistically significant difference in mortalities has occurred between the test and control sediments where a number of different species are exposed. This approach enhances the overall sensitivity of the data analysis by increasing the numerical sample size so that low but consistent mortalities in several species may be shown to be statistically significant in the overall system, even if the mortalities in any one species are not found to be statistically significant in a test based on the single species.

Letter (undated) to Kenneth Kamlet, National Wildlife Federation, from Thomas C. Jorling, Assistant Administrator for Water and Waste Management, and Stephen J. Gage, Assistant Administrator for Research and Development ("Jorling and Gage Letter") at 1. This letter also states that "[w]hile pooling the data may be the best overall approach in many cases, certain situations may arise where . . . the data analysis procedure which should be used . . . is that which provides the most sensitive measure of probable impact." *Id.* The plaintiffs contend that this statement supports their view that pooling cannot provide the "reasonable assurance" re-

quired by the Criteria, 40 C.F.R. § 227.-6(c)(3), that ocean dumping will create no "significant undesirable effects." The Court disagrees. Apparently, the EPA officials responsible for drafting this statement believe that various approaches or procedures may be appropriate under different circumstances. The Implementation Manual also supports the use of alternative modes of analysis. *See* Implementation Manual at F11, ¶ 24. An NYD official has affirmed that the Corps "routinely performed statistical analyses of both individual species and the combination of the mortality data over species." Affidavit of Dennis J. Suszkowski, sworn to October 20, 1978, ¶ 21. The plaintiffs, in response, contend that the Corps has never denied an ocean dumping permit on the basis of the mortality data of individual, as opposed to pooled, species. Plaintiffs' Memorandum II at 24–25. The Court need not, however, resolve this dispute over the Corps' alleged reluctance or refusal to perform individual statistical analyses. The Criteria, the Implementation Manual, and the EPA have granted the Corps a certain degree of discretion to adopt various testing and evaluation procedures. This discretion appears sufficiently broad to support NYD's general or uniform practice of pooling mortality data over species. Notwithstanding the disapproval of certain members of the scientific community, the Court finds that NYD's conduct is neither arbitrary nor contrary to regulatory requirements.

This conclusion is equally applicable to NYD's practice of using a 10% mortality difference between control and test organisms in determining what constitutes a significant undesirable effect due to chronic toxicity or bioaccumulation. Section 227.-6(c)(3) of the Criteria, quoted above, states that test procedures must "provide reasonable assurance, based on considerations of statistical significance of effects at the 95 percent confidence level, that . . . no significant undesirable effects will occur." According to the EPA, "[t]his means that the bioassay tests for comparing the toxicity of test sediments with those of a control area must be designed and conducted so

that, when a statistical analysis of the results is made, there is only one chance in 20 that the analysis will show a difference in toxicity when there is none, or vice versa." Jorling and Gage Letter at 2. There is no relationship between the 10% factor and the concept of statistical significance. *Id.*

NYD's use of a 10% factor is supported by the Implementation Manual which states that "[t]he level of 10 percent is subject to revision if warranted by further studies and experience, but is the level presently considered most realistic for environmental protection purposes by those most familiar with solid phase dredged material bioassays." Implementation Manual at F17–F18, ¶ 37. One marine biologist, who was a member of the Technical Committee that drafted the Manual, has stated:

> The 10 percent factor referred to in Appendix F of the Implementation Manual reflects the considered judgment of professional contributing scientists at the time the Implementation Manual was prepared as to the minimum mean difference in the test results which may be presumed to have environmental significance. Because of the lack of other data on the reliability of the procedure and because of the distinction between statistical and ecological significance, the consensus of the scientists involved in the preparation of the Implementation Manual was that unequivocal evidence of probable ecological harm could be provided only when the bioassay results showed statistical significance at the 95 percent confidence level and a difference between means of at least 10 percent. The environmentally conservative nature of this judgment is illustrated by the empirical conclusions reached by EPA scientists studying test sediments in the Great Lakes region. These scientists . . . concluded that test sediments can be regarded as heavily polluted only if they caused more than 50 percent mortality; test sediments causing mortality differences of less than 10 percent were considered unpolluted.

Affidavit of Richard K. Peddicord, sworn to October 23, 1978, ¶ 5. In response to plaintiffs' allegations that the Criteria requires more than the mere absence of "unequivocal evidence of probable ecological harm" Mr. Peddicord has asserted that "using the best test available, we feel there is no reliable indication of potential environmental harm unless a difference of at least ten per cent between test and reference sediments is indicated." Supplemental Affidavit of Richard K. Peddicord, sworn to February 20, 1979, ¶ 3.

According to EPA officials, the Implementation Manual's reference to a 10% factor

> does not mean that bioassay results which show statistical significance at the 95 percent confidence level, but a difference less than 10 percent between means, indicate in all cases that dredged materials can be dumped without unreasonable impact. Rather, the reliability of the test is felt to be inadequate for such cases, and a decision as to whether or not a permit should be issued would have to be based on the judgment of the permit-issuing authority as to the potential for significant undesirable effects during the particular disposal operation being considered, which could include consideration of side-specific characteristics such as an allowance for initial mixing. In addition, the permit-issuing authority could require that additional tests be run when the results of such tests could be expected to aid materially in reaching a decision.

Use of the 10 percent factor by EPA and the Corps of Engineers as the basis for making decisions as to whether or not dredged material is environmentally acceptable for ocean disposal is an administrative determination of what constitutes a "significant undesirable effect" in the environment. Such an administrative determination was necessary as part of the regulatory mechanism. The factor chosen could have been 0 percent, or it could have been 20, 30, 40 percent or even higher. Instead, EPA and the Corps chose to adopt the factor recommended by those scientists who developed the procedure. A change in this factor will be

considered at any time there is sound scientific evidence which suggests a change may be appropriate.

Jorling and Gage Letter at 3.

The Implementation Manual also reflects the view that no laboratory procedure can consistently paint a perfect picture of environmental impact in the outside world. In this regard, the Manual generally adopts "the environmentally protective approach prescribed in the [Criteria] that any statistically significant increase in mortality compared to the controls is potentially undesirable." Implementation Manual at 10, ¶ 18. The Manual emphasizes, however, that "a statistically significant effect in a laboratory bioassay cannot be taken as a prediction that an ecologically important impact would occur in the field." *Id.*

The plaintiffs contend that the Criteria, the Implementation Manual, and the EPA all recognize that "a 'potential for significant undesirable effects' exists *whenever* a statistically significant increase in mortalities [at the 95 percent confidence level] is demonstrated in a laboratory bioassay." Plaintiffs' Memorandum II at 28. According to the plaintiffs, the language, legislative history, and purpose of MPRSA "make clear that ocean dumping may indeed not be lawfully approved under . . . conditions of such uncertainty and in the face of laboratory evidence of statistically significant adverse impacts." *Id.* They assert that the statute places the burden on the Secretary and the applicant to show that the proposed dumping will not cause environmental degradation or endanger marine life. In the plaintiffs' view, the Corps' use of a 10% factor is scientifically unsound, not supported by a fair reading of the Implementation Manual, and is legally impermissible in light of the burden of proof allocation mandated by MPRSA and reflected in the Criteria.

The Court rejects the plaintiffs' arguments. As amply demonstrated by the statements quoted above, the 10% factor is considered an environmentally acceptable guide in most cases by the agencies responsible for implementing MPRSA and the Cri-

teria. In cases where the 10% figure may be deemed inadequate, "a decision as to whether or not a permit should be issued would have to be based on the judgment of the permit-issuing authority." Jorling and Gage Letter at 3, quoted in full above. While the Criteria speaks in terms of assuring "no significant undesirable effects," it recognizes that only "reasonable assurance" can be provided. 40 C.F.R. § 227.6(c)(2), (3). Similarly, MPRSA requires that ocean dumping not "unreasonably degrade or endanger human health, welfare, . . . or the marine environment." 33 U.S.C. § 1412(a). Both the statute and the Criteria grant the Corps discretionary authority to adopt scientific guidelines that comply with these requirements; they do not establish hard and fast rules. The plaintiffs' contention that "there is no room for the exercise of judgment" whenever a statistically significant increase in mortalities is established, Plaintiffs' Memorandum II at 28, is contrary to the position advocated by the EPA. Recognizing this conflict, the plaintiffs assert that "[w]hich position is correct is not a matter of scientific judgment, but of law." *Id.* The law, however, prescribes the standard of review that must be applied in determining whether the position adopted by the EPA and the Corps violates the statutory mandate. Absent an express MPRSA provision establishing a mandatory statutory standard, and in light of the scientific evidence supporting the defendants' position, the Court concludes that use of a 10% factor in determining statistical significance is permissible.

*The Corps' Procedures Violate NEPA*

 NEPA, quoted in the Background Section above, provides that an agency that approves a project significantly affecting the environment must prepare a statement describing: (1) the environmental impact of the proposed action; (2) any unavoidable adverse effects; (3) alternatives to the proposed action; (4) the relationship between short-term uses of the environment and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that

the proposed action would entail. 42 U.S.C. § 4332(2)(c). The statute may require "a comprehensive impact statement in certain situations where several proposed actions are pending at the same time." *Kleppe v. Sierra Club,* 427 U.S. 390, 409, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). Such a statement may be necessary to assure that an agency satisfies its statutory duty of fully considering environmental effects in making decisions on major projects. *Id.* at 409–10, 96 S.Ct. at 2729–30. Thus, for example, the *Kleppe* Court stated that "when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Id.* at 410, 96 S.Ct. at 2730. Determination of the region that should be covered in a comprehensive statement requires the resolution of complex issues and "is properly left to the informed discretion of the responsible federal agencies." *Id.* at 412, 96 S.Ct. at 2731. Absent a showing of arbitrary action, a court must assume that the agencies have exercised this discretion appropriately. *Id.*

The plaintiffs contend that the Corps has acted arbitrarily and in contravention of NEPA by treating individual ocean dumping projects as "isolated single-shot ventures" and not preparing a programmatic or comprehensive EIS covering the entire Mud Dump Site. The defendants, in turn, argue that the plaintiffs have failed to distinguish between two types of federal actions: (1) EPA's selection of a site for ocean dumping of dredged material; and (2) the Corps' evaluation of a permit application for ocean dumping. According to the defendants, the EPA—not the Corps—is responsible for evaluating the overall environmental impact of using the Mud Dump Site for ocean dumping in the New York Harbor area. Indeed, the defendants state, the EPA is currently preparing an EIS in connection with its site designation that "will include consideration of the cumulative impact of the dumping of dredged material at the New York Mud Dump Site." Affidavit of Bill C. Goodwin, sworn to November 3, 1978

("Goodwin Aff."), ¶ 3; *see* 40 C.F.R. Part 228. With regard to permit applications, the Corps states that its regulations require EIS's, if needed, on a project-by-project basis and provide for treating several related projects in a composite or "umbrella" EIS. See 33 C.F.R. § 209.410. The defendants assert that "[i]f plaintiffs would challenge the failure of the [NYD] to perform a 'programmatic' or 'comprehensive' EIS regarding some identified pending or issued permits for which individual EIS's or [Environmental Impact Assessments] were performed, there would be a factual context in which the parties could litigate the merits of a decision not to do such an EIS." Defendants' Memorandum I at 38. Absent a challenge to a specific permit or project, the defendants contend that the plaintiffs are seeking an overly broad, abstract ruling that a single EIS is required to deal with all Mud Dump projects "now and forevermore."

The Court rejects the defendants' contention that the Corps should not be held responsible for providing a programmatic EIS if it is determined that such a document is required. First, as noted above, the Corps' own regulations provide for the preparation of an "umbrella EIS" covering several related projects. Even after MPRSA was enacted, the Corps recognized its own responsibility—apart from the EPA—in preparing an EIS for the Mud Dump Site. See Memorandum from John Zammit, Operations Division Chief, NYD, dated November 3, 1976, Plaintiffs' Exh. 55. Second, notwithstanding the Corps' assertion that the EPA is currently preparing a cumulative EIS, the Court has not been informed of the progress or completion of such a document even though it was alleged that it would be available at the end of 1979. See Goodwin Aff. ¶ 4. The Corps need not retrace steps taken by the EPA or engage in unnecessary duplication of the EPA's efforts. However, the Corps cannot escape its own responsibilities by continuing to rely on another agency's work-in-progress. Third, the Corps concedes that the site selection EIS prepared by EPA will

not address alternatives to ocean dumping, one of the critical elements required under NEPA. Finally, in a somewhat different context, the Second Circuit has indicated that as between federal agencies, the responsibility for preparing a comprehensive EIS should be borne by the agency that consistently oversees the projects conducted in the area. *See Natural Resources Defense Council v. Callaway, supra,* 524 F.2d at 86. In short, if a programmatic EIS complying with NEPA requirements must be prepared for the Mud Dump Site, the Corps may be held responsible for providing such a document either in conjunction with, or partial reliance on, EPA reports.

█ The Court also rejects defendants' argument that the plaintiffs' NEPA claim cannot be resolved absent a challenge to a specific permit or project. The ocean dumping at issue here constitutes a steady flood of activity in a well defined area. While the materials dumped may differ in degree from project to project, the tremendous amount of generally homogeneous dredged materials dumped annually into the Mud Dump Site provides a concrete factual context on which to base a comprehensive EIS. For example, in 1976, approximately 8.1 million cubic yards of dredged materials were disposed of at this Site. Department of Army, Corps of Engineers, 1976 Report to Congress on Administration of Ocean Dumping Activities (1977) at 13, cited in Plaintiffs' Memorandum I at 87. Almost all the dredging that occurs within the NYD takes place in New York Harbor, and 95% of all the material dumped in the Harbor goes to the Mud Dump. The Proceedings of the New York Dredged Material Disposal Alternatives Workshop (1977) at 11, 18, 27, cited in Plaintiffs' Memorandum I at 85–86. The Corps has projected the continued generation of dredged material within the NYD at rates exceeding 9 million cubic yards per year, through at least 1997. Howard, Needles, Tammen & Bergendoff, Phase One/Feasibility Study on Dredged Material Disposal in New York Harbor and the New York Bight (1976) at C–9, cited in Plaintiffs' Memorandum I at 87. As stated by the plaintiffs and undis-

puted by the defendants, the Corps has "direct responsibility for some 45 navigation projects in the New York Harbor area, nearly all of which involve ocean dumping of dredged material at the Mud Dump Site, in addition to permit responsibility for numerous private projects involving dumping at the same site." Plaintiffs' Memorandum I at 88. Although the defendants challenge the plaintiffs' failure to identify specific proposals pending before the Corps, the plaintiffs' exhibits amply demonstrate that numerous applications for ocean dredging permits are submitted to the agency. On the basis of the documentary and statistical evidence submitted, which is basically unchallenged by the defendants, the Court concludes that the need for a programmatic EIS can be determined without singling out one proposal as the sole object of this challenge. *See Natural Resources Defense Council v. Callaway, supra,* 524 F.2d at 88.

█ The importance of a programmatic EIS has frequently been recognized and emphasized by the Second Circuit.

The purposes of NEPA are frustrated when consideration of alternatives and collateral effects is unreasonably constricted. This can result if proposed agency actions are evaluated in artificial isolation from one another. Accordingly, an agency is required to consider the full implications of each decision in light of other potential developments in the area, and to prepare a comprehensive impact statement if several projects are significantly interdependent. *Kleppe v. Sierra Club,* 427 U.S. 390, 408, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576, 590 (1976); *Chelsea Neighborhood Ass'n v. United States Postal Service,* 516 F.2d 378, 388 (2d Cir. 1975); *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 87–90 (2d Cir. 1975). A balance must sometimes be struck between the importance of going forward with a project presently under consideration and the danger of improperly "piggybacking" several related projects by justifying each of them on the assumption that the others are to be con-

structed, only to discover later that the overall combination of the projects may do more harm than good. *Greene County Planning Bd. v. Federal Power Comm'n,* 559 F.2d 1227, 1232 (2d Cir. 1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). In determining whether an agency's EIS satisfies the requirements established by NEPA, a district court is governed by a "rule of reason." The report need not be "exhaustive" but must be compiled in good faith and set forth sufficient information to enable the decision maker "to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives." *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

█ The defendants correctly point out that in *Natural Resources Defense Council v. Callaway, supra,* and other cases relied upon by the plaintiffs, preparation of a programmatic EIS was not required. The Second Circuit has repeatedly held, however, that in preparing an EIS for a particular project, an agency must consider the environmental impact of related activities and possible alternatives to the action proposed. *See, e. g., Monroe County Conservation Council v. Adams,* 566 F.2d 419, 422, 425 (2d Cir. 1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *City of Rochester v. United States Postal Service,* 541 F.2d 967, 973–74 (2d Cir. 1976); *Natural Resources Defense Council v. Callaway, supra,* 524 F.2d at 89–90. This Court has already ruled that the plaintiffs' decision not to challenge any particular project or EIS does not detract from the viability or merits of their claim. An agency's duty under NEPA may vary according to the facts of a particular case, and the Court must exercise its judgment in determining what is reasonable under the circumstances. *County of Suffolk v. Secretary of the Interior, supra,* 562 F.2d at 1375. Although the Supreme Court has suggested that the ap-

propriate time for a court to enter the process is "when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement," the Corps' actions regarding the Mud Dump Site have "reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption." *Kleppe v. Sierra Club, supra,* 427 U.S. at 406 n. 15, 96 S.Ct. at 2728–2729.

█ The Corps has consistently adhered to the position that it can determine the need for an EIS on a project-by-project basis. Accordingly, it has never attempted to argue that any of the few EIS's prepared in connection with projects at the Mud Dump Site constituted a programmatic or comprehensive EIS. Nor does the Corps directly refute the contention made in plaintiffs' 1978 memorandum that ocean dumping at the Mud Dump Site has generated only eight EIS's regarding federal projects and one on a project proposed by a private applicant. See Plaintiffs' Memorandum I, citing Letter from John Zammit, Operations Division Chief, NYD, dated June 6, 1978, annexed as Exh. 39. The only examples of EIS's and Assessment Reports prepared by or for the Corps are those originally submitted by the plaintiffs when they instituted this action. *See, e. g.,* Plaintiffs' Exhs. 42, 43, 45. Upon reviewing these reports, the Court concludes that they fall far short of presenting a comprehensive picture of the environmental impact of the proposed activity including the various factors required to be examined under NEPA. In fact, some of these reports expressly indicate that additional, in-depth studies are required to adequately assess the full impact of dumping huge quantities of dredged material in the Mud Dump Site. *See, e. g.,* Final Environmental Statement, Maintenance of the Raritan River, New Jersey Navigation Project, prepared by NYD, dated April 1976, at 7, Plaintiffs' Exh. 45; Final Environmental Statement, Maintenance of Bay Ridge and Red Hook Channels, New York Navigation Project, prepared by NYD, dated April 23, 1973, at 5,

Plaintiffs' Exh. at 43. Accordingly, the Court concludes that a programmatic or comprehensive EIS complying with NEPA requirements must be provided by the defendants with respect to the ocean dumping of dredged materials in the Mud Dump Site.

*Conclusion*

After ruling that the plaintiffs' claims are ripe for review and can be entertained in the absence of the EPA, the Court found that the Corps' current testing and evaluation procedures are neither arbitrary nor clearly in contravention of MPRSA or the Criteria. The extensive ocean dumping of dredged material that occurs at the Mud Dump Site must, however, be the subject of a full-scale, comprehensive EIS, and the Corps is responsible for providing such a report. In fulfilling this obligation, the Corps may rely upon or incorporate studies or reports compiled by the EPA. The Court is reluctant to establish a firm deadline for the provision of such a document. However, it will entertain further arguments from the parties if they cannot arrive at a reasonable and mutually acceptable timetable for completing such a report. In this regard, the Court again notes that the Corps has represented that the EPA's comprehensive site selection study of the Mud Dump Site, which would partially satisfy NEPA's requirements (the EPA report was not intended to include a discussion of alternatives to ocean dumping), was to have been completed by the end of 1979. *See* Goodwin Aff. ¶ 4. Therefore, it appears that the Corps should be in a position to comply expeditiously with this Court's ruling.

Accordingly, the Court grants summary judgment to the defendants on the first two claims and to the plaintiffs on the third claim.

So ordered.